[L. A. No. 6985. In Bank.—January 30, 1924.]

BEN MILLER, Respondent, v. GERMAIN SEED & PLANT COMPANY (a Corporation), Appellant.

[1] SALES—SEED—CERTAIN VARIETY—WARRANTY.—Where a purchaser asks a seed dealer for a certain variety of seed and in pursuance of that request seed is furnished, in the absence of any additional facts the law will, from the transaction, imply a contract of warranty.

[2] ID.—CONTRACT—WARRANTY—GENERAL CUSTOM—EVIDENCE.—In an action for damage for breach of warranty as to the variety of celery seed, in determining the contract of the parties as to whether or not there was a warranty, not only the character of the business conducted by the purchaser and by the seller, but also the general custom of seed dealers not to warrant the character of the seed sold, may be taken into consideration.

[3] ID. — CONTRACT — CUSTOM — NOTICE — PRESUMPTION.—The rule is uniform that a party to a contract may be bound by a custom not inconsistent with the terms of the contract even though he is ignorant of the custom, if that custom is of such general and universal application that he may be conclusively presumed to know the custom.

[4] ID. — WARRANTY — FACTORS CONSTITUTING.—In order that a sale shall be upon a warranty there must be two factors present,—first,

---

4. Warranties and conditions upon the sale of seed, nursery stock, etc., notes, 102 Am. St. Rep. 623; Ann. Cas, 1918B, 72; Ann. Cas. 1918E, 485; 16 A. L. R. 859.

Liability of the vendor of seeds, notes, 37 L. R. A. (N. S.) 79; L. R. A. 1916C, 1011.

an affirmation of a fact by the seller with reference to the thing sold, and, second, an intention on the part of the seller that his affirmation shall be a warranty to the buyer. The affirmation of the fact is shown by direct evidence, and the intent to warrant is inferred from the facts and circumstances surrounding the sale.

[5] ID.—SEED FOR PLANTING — DESCRIPTION — WARRANTY — INTENT.— In the case of the sale of seed for planting, the description of the seed by the seller is an affirmation of a fact concerning the thing sold; and from the fact that seed is sold for planting and that the description of the seed is, therefore, a vital element in the contract, the intent, on the part of the dealer, to warrant that vital fact to the buyer is inferred.

[6] ID.—IGNORANCE OF GENERAL CUSTOM—WARRANTY.—A customer cannot by his mere ignorance of a general custom of nonwarranty impose upon a dealer a contract of warranty which he never intended to make and which the slightest inquiry would disclose to the purchaser was not intended to be made.

[7] ID.—GENERAL CUSTOM — INTENT — CONTRACT.— General custom or usage must be considered in determining the intent of the parties, and is in effect a part of the contract unless the contract manifests a contrary intent.

APPEAL from a judgment of the Superior Court of San Diego. C. N. Andrews, Judge. Reversed.

The facts are stated in the opinion of the court.

Eugene Daney for Appellant.

E. L. Johnson for Respondent.

Lawler & Degnan, *Amici Curiae.*

WILBUR, C. J.—The plaintiff purchased celery seed from the defendant. The seed turned out to be a different variety from that ordered. This action was brought to recover the damages suffered by the plaintiff. Judgment was rendered in favor of the plaintiff and the defendant appealed. The main question presented by the record is whether or not there was a warranty of the seed and a consequent responsibility for the damages suffered by the plaintiff.

The plaintiff was engaged in raising celery for the market and the defendant was engaged in the sale of seeds and

plants. On March 16, 1920, the plaintiff ordered $20 worth of celery seed of the Golden Yellow California stock, and on April 8, 1920, he ordered $12 worth of celery seed of the Golden Yellow Celery California stock. The orders were by letter. The defendant complied by forwarding two bags of celery seed. Aside from the address of the purchaser and seller, the only marking upon the seed was the following: "Germain. Germain Seeds Germinate. Seeds. Los Angeles, California." The seeds were not the character of seed ordered but were of a variety known as Green celery seed. The two varieties of seed were indistinguishable one from the other and the celery plants could not be distinguished until approaching maturity; when the bleaching process was applied it was discovered by reason of the fact that they would not bleach properly that they were of the variety known as Green celery seed.

The plaintiff claimed to be damaged in the sum of $11,900, but the jury returned a verdict in plaintiff's favor for the sum of $4,000 only. The most serious question raised by the appeal is as to whether under all the facts and circumstances shown in the case there was a warranty by the defendant of the character of seed supplied by it to the plaintiff. This question turns largely upon the claim of the appellant that under the general custom of seed dealers there is no warranty of the character of the seed sold and that the defendant in the conduct of its business makes every effort possible to apprise the purchaser of seed of that fact. The trial court instructed the jury that if there was a custom of nonwarranty on the part of seed dealers that the plaintiff could not recover upon the alleged warranty if he had notice or knowledge of such custom, but the trial court refused to instruct the jury as requested by the defendant that if there was a general custom of nonwarranty the plaintiff would be bound thereby even if he did not in fact know of such custom or usage. To state it more concretely the question arises upon the refusal of the trial court to give the following instructions proposed by the defendant:

"Where there is a general custom and usage appertaining to a business, which custom or usage is so universal in its application that it is presumptively known to all who have dealings in the business to which it is applicable, then I

charge you, that unless there is a contract to the contrary, such general custom or usage is presumed to be taken into consideration by all parties in entering into the transaction, so that if in this case it should appear from the evidence that there is a general custom or usage of the seed trade that no seeds are warranted as to name, description, productiveness or other matter, and if you find from the evidence that such custom is so universal that it must be presumed to have been known by people who have transactions in the seed business, then I charge you, that such custom or usage is as much a part of the contract of purchase and sale as if it had been expressly so stipulated.''

"If you find from the evidence in this case that it is, and has been for many years, the general custom of the seed trade in the state of California not to warrant either the description, quality, productiveness or any other matter of seeds, then I charge you, as a matter of law, that the plaintiff in this case is presumed to have known such custom, and it will be presumed, in the absence of any express understanding to the contrary, that such custom is a part of any dealings in such trade or business, and in such case it is not necessary that there should be on or in the package containing the seed any notice of nonwarranty, nor is it necessary if such notice of nonwarranty is on, or in the package containing such seed that it be read by the buyer, because the custom of the trade is part of the contract unless excluded by an expressed agreement to the contrary.''

"If you find from the evidence in this case that it is the custom of the seed trade in California and has been the custom for many years not to warrant the description, quality, or productiveness of seeds bought or sold, and that this custom is a well-established one, and well known to those either buying or selling seeds, then I charge you, that notwithstanding the fact, if it be a fact, that the plaintiff may have not seen the disclaimer notice which the defendant used in his business, or if he did see it that he did not' read it, or even if the defendant entirely omitted to enclose one with the seeds, still the general custom and usage of the seed business would control the transaction unless there was an express contract to the contrary.''

Testimony was introduced by the defendant upon the subject of custom which would require the giving of these instructions if they are correct statements of the law. The question for determination then is, whether or not from the facts and circumstances shown there was a contract of warranty between the purchaser and seller of the seeds. If it was the general custom of all seed dealers, including the defendant, to refuse to warrant the character of the seed sold by them, and if the price for seed was fixed in view of this uniform custom it is evident that if we hold that the seller is; under the circumstances, liable upon a warranty of the character of the seed, we thereby hold the defendant to the terms of an agreement which it did not in fact intend to make. It is clear that if the purchaser of the seed had inquired of the seller whether or not it would warrant the character of the seed that the seller would have replied in the negative. It may be conceded that **[1]** where a purchaser asks a seed dealer for a certain variety of seed and in pursuance of that request seed is furnished, that in the absence of any additional facts the law will, from the transaction, imply a contract of warranty. This warranty partakes of the nature of both an express and implied warranty. It is express in the sense that it is based upon the express language used by the purchaser in his order or request, it is implied in the sense that results from the circumstance that the request for seed is from a grower of celery to a seller of celery seed for the purpose of raising celery plants, and, therefore, the character of the seed is an essential and vital provision of the contract between the parties. It is, of course, conceded that if there had been a written warranty or an expressed oral warranty of the character of the seed, the custom of the dealer in other cases not to give such a warranty would have no bearing upon the terms of the express warranty. **[2]** The question here is somewhat different, namely, whether or not in determining the contract between the parties we should consider not only the character of the business conducted by the purchaser and by the seller, but also the general custom of seed dealers not to warrant the character of seed sold by them.

The supreme court of the state of Wisconsin had occasion to consider the subject now before us in the case of *Ross*

v. *Northrup, King & Co.*, 156 Wis. 327 [144 N. W. 1124], in 1914. The court in that case said:

"There is still another insurmountable difficulty in the way of plaintiff's recovery. The jury found that at the time of the sale there was 'a general custom in the Northwest, including Wisconsin, among seedsmen such as the defendants, to refuse to warrant seeds.' The jury also found that the plaintiff did not know of such custom. The jury made no such finding in reference to Morton. There is no evidence to show whether he knew of such custom or not. He did testify that he had no notice from any source that the defendant would not sell its seeds with a warranty. This might all be true and still the general custom such as the jury found might not only exist, but Morton might have knowledge of it. It is probable that, had he been asked the direct question, he would have denied all knowledge of the custom, and we will assume that on the evidence referred to the court might have found lack of knowledge, and that it actually did so find.

"It is not the law that ignorance of a general trade custom relieves a party from the effect of it. If there was a general custom among seedsmen such as was found, Morton as a retail dealer in seeds was bound to know of it.

"'The object of proving a general custom is not to contradict or change a contract made between the parties, but to interpret it to the court and jury as it was understood by the parties at the time it was made; and this evidence of a general custom, when it does not contradict or change the express terms of the written contract, is admitted for the purpose of showing what the real contract, between the parties was. . . . And, when it is clearly proven, the parties are supposed to have contracted with reference to such custom, unless such custom changes the express terms of the written contract.' (*Hewitt* v. *John Week L. Co.*, 77 Wis. 548, 556 [46 N. W. 822], and cases cited.)

"'A uniform trade custom is readily accepted by courts to define what is ambiguous or is left indeterminate in a contract, where both parties have knowledge of the custom, or are so situated that such knowledge may be presumed, for the reason that the majority of such transactions are had in view of the custom, and the agreement on which the minds of the parties actually met will thereby be carried

into effect. . . . Where the custom is proved to be known to both, it may even add terms to the contract. . . . Where the custom is *general*, it will be presumed to have entered into the contract, and one may be bound thereby although ignorant, unless the other party be shown to have knowledge of his ignorance.' (*Gehl* v. *Milwaukee P. Co.*, 105 Wis. 573, 580 [81 N. W. 663].)

"Replying to the argument of counsel in another case, that a custom in order to be binding must be known to both parties to the contract, or it must have existed a sufficient length of time to raise a presumption of knowledge, the court said:

" 'That rule of course prevails in case of an attempt to annex to a contract some incident not expressed therein, as in the case of *Hewitt* v. *John Week L. Co.*, 77 Wis. 548 [46 N. W. 822], where the question was whether the owner of a sawmill, under his contract to saw logs by the thousand, was entitled to the slabs. There is a difference between evidence of usage to establish a custom for the purpose of annexing that as an incident to a contract, and the same kind of proof to show the meaning of some word or term used in a contract. In the latter situation the meaning of the term as understood at the time and place of the contract governs, whether both of the parties knew of such meaning or not. They are presumed to contract with reference to the meaning of words and terms used by them, as such words and terms are understood at the place of their contract.' (*Shores L. Co.* v. *Stitt*, 102 Wis. 450, 455 [78 N. W. 562].)

"The case at bar is in its facts very much like one recently decided by the Supreme Court of Iowa, from which we quote the following:

" 'The alleged liability of the Younkerman Seed Company may be considered first. The evidence that a general custom, such as pleaded, prevails in the seed trade was conclusive. The particular package had the printed matter thereon, and, though this may not have been noticed, the sale is presumed to have been negotiated with reference to the general custom of the trade. . . . This being so, a warranty that the seed was true to name could not be inferred, and the court rightly found in favor of the Younkerman Seed

Company.' (*Blizzard Bros.* v. *Growers' C. Co.*, 152 Iowa, 257 [132 N. W. 66, 67].)''

The supreme court of Iowa rendered a decision to the same effect which is cited and quoted in the decision by the supreme court of Wisconsin (*Blizzard Bros.* v. *Growers' C. Co. supra*).

[3] The rule seems to be uniform that a party to a contract may be bound by a custom not inconsistent with the terms of the contract, even though he is ignorant of the custom, if that custom is of such general and universal application that he may be conclusively presumed to know of the custom. (See 2 Page on Contracts, sec. 604, p. 925.) The author of this text-book states the rule in that regard as follows: ''To be regarded as part of a contract, however, the usage or custom must have both of the foregoing elements. (1) It must be actually or constructively known; and (2) it must be consistent with the contract. If either of these elements is lacking the usage or custom cannot be regarded as part of the contract. If the usage is neither actually or constructively known to one of the parties to the contract, it is not binding upon him.''

In the case of *Rauth* v. *Southwest Warehouse Co.*, 158 Cal. 54 [109 Pac. 839], it was assumed that a seller of seed would be bound by ''a custom or usage so notorious that defendant must be presumed to have known it, for actual knowledge was not shown, to the effect that the term 'barley' did not include barley exactly like the common bearded variety ordinarily grown in Orange County. . . . ''

The rule that a person will be presumed to have contracted with reference to a general custom or usage whether he knew of that custom or not has frequently been invoked. In *Steidtmann* v. *Joseph Lay Co.*, 234 Ill. 84 [84 N. E. 640], it was said (pp. 88, 89): ''A person entering into a contract in the ordinary course of business is presumed to have done so in reference to any existing general usage or custom relating to such business. (*Collins Ice Cream Co.* v. *Stephens*, 189 Ill. 200 [59 N. E. 524]; *Chisholm* v. *Beaman Machine Co.*, 160 Ill. 101 [43 N. E. 796]; *Leavitt* v. *Kennicott, supra.*) And this is so whether he knew of the custom or not. (*Samuels* v. *Oliver*, 130 Ill. 73 [22 N. E. 499]; *Taylor* v. *Bailey*, 169 Ill. 181 [48 N. E. 200]; *Lyon* v. *Culbertson*, 83 Ill. 33; *Doane* v. *Dunham*, 79 Ill. 131; *Bailey*

v. *Bensley,* 87 Ill. 556.) Such general custom and technical meaning of words may be proved without being specially pleaded. (*Stewart* v. *Smith,* 28 Ill. 397; *Lowe* v. *Lehman, supra.*) The evidence offered should have been admitted.''

The court of appeals in Maryland, in *Lyon* v. *George,* 44 Md. 295, said:

''The defendant not being able to offer direct proof of the contract between himself and the plaintiffs, was seeking to establish it by indirect and circumstantial evidence. The usage offered in evidence, had certainly an important bearing upon the issue on trial. Where uniform and well established, it has been held to shape the contracts of parties, and serve as a guide to their true meaning and understanding. However well established, it may undoubtedly be controlled by a special contract, but in the absence of evidence of such special contract, where services are rendered, and a uniform usage is shown to exist in regard to such services, it will be presumed that they are rendered in accordance with the usage. In *Given* v. *Charron,* 15 Md. 507, the identical question arose. There the action was brought to recover for an alleged wrongful dismissal of the plaintiff from the employment of the defendant. No direct evidence was offered of the contract between the parties. But to show what the contract was, the plaintiff proposed to offer testimony of a usage among dry-goods jobbers, such as the defendant, in regard to the terms upon which they employed their clerks. This court speaking through Le Grand, C. J., say in regard to the admissibility of the evidence: 'We think the testimony was properly admitted. It was pertinent to the contract declared upon, and a link in the chain of evidence, to establish a custom existing among dry-goods jobbers, as to the time for which they were to be understood as employing clerks, when nothing was said in regard to it.' In *Renner* v. *Bank,* 9 Wheat. 581 [6 L. Ed. 166, see, also, Rose's U. S. Notes], evidence of the usage of banks in the District of Columbia, in regard to the day of demanding payment upon bills of exchange and promissory notes, was held to be admissible for the purpose of explaining the understanding of parties as to their contracts. This authority was recognized and followed in *Bank* v. *Magruder,* 6 H. & J. 180, and in *Bank* v. *Fitzhugh,* 1 H. & G. 248.

"The objection to the admissibility of the evidence, that its offer was not accompanied with an offer to prove that the usage was known to the plaintiffs cannot be sustained. The defendant was under no legal obligation to offer such proof. The contract was entered into with a member of the plaintiffs' firm, since dead, and the knowledge of the usage, on his part, when the agreement to employ the defendant as agent was made, will be presumed in law. This doctrine is so strongly recognized in *Bank* v. *Fitzhugh, supra,* that it may now be considered a settled question in this State, and it is unnecessary to refer to other cases in support of it."

The supreme court of Michigan, in *Austrian & Co.* v. *Springer,* 94 Mich. 343 [34 Am. St. Rep. 350, 54 N. W. 50], said: "The rule is that the custom must be one so well settled and notorious as to raise the presumption that it was known to buyer and seller. Mechem, Ag. Sec. 348. This presumption was not, therefore, rebutted by defendant's testimony that he was not aware of such custom, although it might have been, had the custom been shown to have been a purely local one. This was shown to be a general custom pertaining to the glass trade in this country, and not confined to any particular locality, as was the case in *Pennell* v. *Transportation Co.,* 94 Mich. 247."

In *Laver* v. *Hotaling,* 5 Cal. Unrep. 534 [46 Pac. 1070], this court held that the custom or rule of an architects' association fixing their compensation was not binding upon a layman ignorant of the rule, but distinguished the case from the rule concerning a general custom as follows: "It was not accompanied by any proof that the rule or usage of architects was known to the defendant at the time of the alleged contract with plaintiffs, nor that it was so generally accepted and acted upon by the public as to give it the standing of a custom, reasonable, uniform, and notorious, knowledge of which was to be imputed to him. In the absence of such complementary proof, the law, as we understand it, does not allow that a rule for professional guidance, adopted by organizations or societies of the members of any profession, is competent evidence in their favor in controversies with lay employers regarding the quantum of their compensation. . . . We do not deny the principle illustrated by *Sewell* v. *Corp.,* 1 Car. & P. 392, *Thomas* v. *Brandt*

(Md.), 26 Atl. 524, and other cases, that, if there is a general usage, applicable to the charges of a particular profession, it may be looked to in order to determine the compensation to be paid by one who employs an individual of that profession; but we hold that such a usage cannot be proved for that purpose against laymen by showing a rule adopted within the profession only.''

This court in a number of cases has held a party to a contract bound by general usage or custom, although he did not know of it. We have held that a general usage cannot become ineffective merely because of an actual or professed ignorance of that custom (*Nicoletti* v. *Bank of Los Banos,* 190 Cal. 637 [27 A. L. R. 1479, 214 Pac. 51]). In that case we said:

"This court in *Davis* v. *First National Bank of Fresno,* 118 Cal. 600 [50 Pac. 666], held that the usage of the bank to send its commercial paper to its correspondent banks for collection was binding upon the customer, even if he was ignorant of the usage and made no inquiries in reference thereto. In that regard the opinion states as follows:

" 'The court should also have permitted the defendant to show by the witnesses, which it called for that purpose, the usage of banks in regard to the collection of paper presented by persons who were unknown to them, and that the defendant conformed to that usage (*Warren Bank* v. *Suffolk Bank,* 10 Cush. 582). If such usage was reasonable and did not contravene any principles of law, the fact that the defendant followed it would tend to show that it exercised reasonable care in seeking to collect the draft. One who gives a draft to a bank to collect is held to have an implied knowledge of its usage in collecting drafts, so far as such usage does not contravene any rule of law. (Morse on Banking, sec. 9; *Bank of Washington* v. *Triplett,* 1 Pet. 25 [7 L. Ed. 37, see, also, Rose's U. S. Notes].) ''The fact that one deals with the bank without taking the trouble to inquire as to its system will raise the implication that he already knows and is satisfied with that system. It is clear that if a person hands over a note to a bank for collection, without any species of remark as to the course to be pursued, the bank is not bound to thrust upon him a statement of its intended course and to retain him until the whole theory has been expounded to him, when his conduct unmistakably

shows that either he already knows it, or else he does not desire to know it.   Either he knows and approves it, or he voluntarily trusts to the wisdom of the bank at his own deliberately assumed risk of its sufficiency.   In such a case the bank not only has a right to assume, but it is even positively bound to assume, that his desire is that the ordinary and established usage be pursued.'' '   (See, also, *San Francisco National Bank* v. *American National Bank,* 5 Cal. App. 408 [190 Pac. 558].)''

There seems to be no good reason why the rule applied in the case of *Nicoletti* v. *Bank of Los Banos, supra,* and in the cases therein cited, should not apply to the purchase of seeds from a person engaged in the business of selling seed.

In connection with the effect of custom upon the transaction here in question, it is suggested, however, that inasmuch as the warranty of the seller of seed to the buyer of seed is an ''express'' warranty, that such warranty cannot be contradicted or modified by a custom of the seed trade not to warrant their seed sold.   This suggestion requires a consideration of the meaning of the term ''express warranty'' as applied to sales of personal property.   In Benjamin on Sales, seventh edition, sections 610, 613, pages 610, 611, 612, it is said:

''Sec. 610.   A warranty in a sale of goods is not one of the essential elements of the contract, for a sale is none the less complete and perfect in the absence of a warranty. But it is a collateral undertaking, *forming part of the contract* by the agreement of the parties express or implied. [*Foster* v. *Smith,* 18 Com. B. 156; *Mondel* v. *Steel,* 8 Mees. & W. 858; *Street* v. *Blay,* 2 Barn. & Ad. 456; *Chanter* v. *Hopkins,* 4 Mees. & W. 399.]   It follows, therefore, that antecedent representations made by the vendor as an *inducement* to the buyer, but not forming part of the contract when concluded, are not warranties. . . .

''Sec. 613.   No special form of words is necessary to create a warranty.   It is nearly two hundred years since Lord Holt first settled the rule, in *Cross* v. *Gardner* [Carth. 90; 3 Mod. 261; 1 Show. 68], and *Medina* v. *Stoughton* [1 Ld. Raym. 593; L. Salk. 210], which Buller, J., in 1789, laid down in the opinion given by him in the famous leading case of *Pasley* v. *Freeman* (3 Term Rep. 51, at p. 57; 2 Sm. L. C., p. 74 (ed. 1887)], as follows: 'It was rightly held

by Holt, C. J., and has been uniformly adopted ever since, that an affirmation at the time of a sale is a warranty, provided it appear in evidence to have been so intended.'

"And in determining whether it was so intended, a decisive test is, whether the vendor assumes to assert a *fact* of which the buyer is ignorant, or merely states an opinion or judgment upon a matter of which the vendor has no special knowledge, and on which the buyer may be expected also to have an opinion, and to exercise his judgment. In the former case there is a warranty, in the latter not."

Our Civil Code (section 1763) defines a warranty in somewhat different terms, as follows: "A warranty is an engagement by which a seller assures to a buyer the existence of some fact affecting the transaction, whether past, present or future." This general statement is broad enough to cover mere representations of any fact, unless the word "assures" is given a more limited meaning than the word "represents." The general statement in section 1763 of the Civil Code is also limited by the provisions of the next section (1764), as follows: "Except as prescribed by this article, a mere contract of sale or agreement to sell does not imply a warranty." The rule for determining whether a representation of a fact is to be treated as an assurance to the buyer, that is as a warranty, is stated in the articles on "Sales" in Cyc., as follows (35 Cyc., pp. 374, 375):

"4. Intention of Parties. An affirmation made by the seller with respect to the thing sold amounts to a warranty if it appears to have been so intended and understood by the parties, and not as a mere matter of opinion or judgment. The rule is broadly stated in most decisions that a mere affirmation does not constitute a warranty unless shown to be so intended and understood by the parties, and not as a mere matter of opinion; that in the contract of warranty, there must be an agreement of the minds of the contracting parties as in all other contracts. And while there are decisions to the effect that the actual intent of the seller to warrant the thing sold is immaterial if the affirmations made—whether written or oral—and relied on by the buyer as an inducement to purchase, import a warranty, that the seller is responsible for the language he uses, . . . The true aim in construing every agreement, that of warranty included, is of course, to reach the real intention of

the parties to it. This is accomplished, not by taking what they may afterward say their intentions were, but what they appear to have been from the words employed, the occasion of using them, and all accompanying facts and circumstances explanatory thereof. . . . ''

This court has adopted the rule as stated in Benjamin on Sales and in Cyc. In *McLennan* v. *Ohmen,* 75 Cal. 558 [17 Pac. 687], it is said: ''To create an express warranty the word 'warrant' need not be used, nor are any particular words necessary. Any affirmation made at the time of the sale as to the quality or condition of the thing sold will be treated as a warranty, *if it was so intended,* and the purchaser bought on the faith of such affirmation; and whether it was so intended and the purchaser acted upon it, are questions of fact for the jury.'' (Italics ours.)

This decision followed the earlier case of *Polhemus* v. *Herman,* 45 Cal. 573, where the rule was stated as follows: ''It is certain that no particular words are necessary to create a warranty. Any affirmation made at the time of sale as to the quality or condition of the thing sold will be treated as a warranty *if it was so intended.*'' (Italics ours.) (See, also, *Hackett* v. *Lewis,* 36 Cal. App. 687, 688 [173 Pac. 111], and *Firth* v. *Richter,* 49 Cal. App. 545 [196 Pac. 277].)

[4] It is established by the foregoing authorities that in order that the sale shall be upon a warranty there must be two factors present,—first, an affirmation of a fact by the seller with reference to the thing sold, and, second, an intention on the part of the seller that his affirmation shall be a warranty to the buyer. The affirmation of the fact is shown by direct evidence, and the intent to warrant is inferred from the facts and circumstances surrounding the sale. [5] In the case of the sale of seed for planting, the description of the seed by the seller is an affirmation of a-fact concerning the thing sold. From the fact that seed is sold for planting and that the description of the seed is therefore a vital element in the contract, the intent, on the part of the dealer, to warrant that vital fact to the buyer is inferred. We have thus the two essentials of a warranty. If, however, there is a general custom among sellers of seed not to warrant the seed sold by them, we cannot, in the face of this universal custom, infer an intent on their part to warrant the seed from the facts and circumstances of the

sale, because among these facts and circumstances is the custom of nonwarranty, which precludes the inference of an intent to warrant. In such a case the proof of the custom does not contradict or vary the terms of an express warranty, but establishes that there never was any (express) warranty at all, for the intent to warrant was absent. It is conceded in this case that if the purchaser knew of the custom he could not recover, and the court so instructed the jury. This being conceded the only remaining question is whether a purchaser who contracts with dealers in seed is bound by such a general custom of the seed trade, even if ignorant of the custom. [6] A customer cannot by his mere ignorance of a general custom of nonwarranty impose upon a dealer a contract of warranty which he never intended to make and which the slightest inquiry would disclose to the purchaser was not intended to be made.

Our code points to the same conclusion we have reached by a consideration of the decisions from this and other states, and from the fundamental principles involved in the transaction. "A contract is either express or implied" (Civ. Code, sec. 1619). "An express contract is one, the terms of which are stated in words" (Civ. Code, sec. 1620). "An implied contract is one, the existence and terms of which are manifested by conduct" (Civ. Code, sec. 1621). So far, then, as a warranty is based upon the language used by the parties, it is an express contract, and so far as it is "manifested by conduct," it is an "implied contract." From other code sections it is clear that in determining whether or not a contract of warranty is to be thus implied we may consider general custom or usage. "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates" (Civ. Code, sec. 1647). "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract" (Civ. Code, sec. 1648). "Stipulations which are necessary to make a contract . . . *conformable to usage,* are implied, in respect to matters concerning which the contract manifests no contrary intention" (Civ. Code, sec. 1655). (Italics ours.) "All things that in law *or usage* are considered as incidental to a contract, or as necessary to carry it into effect,

are implied therefrom, unless some of them are expressly mentioned therein, when all other things of the same class are deemed to be excluded'' (Civ. Code, sec. 1656). ·(Italics ours.)

The foregoing code rules are laid down ''For the purpose of ascertaining the intention of the parties to a contract, . . . '' (Civ. Code, sec. 1637). **[7]** It is clear, then, that general custom or usage must be considered in determining the intent of the parties, and are in effect a part of the contract unless the contract manifests a contrary intention (Civ. Code, sec. 1655, *supra*).

It should be noted that we are discussing proposed instructions to a jury concerning a general custom, and not an undisclosed custom of an individual seller, or a purely local custom, of which the buyer was ignorant.

The court erred in refusing the defendant's proposed instructions.

Judgment reversed.

Myers, J., Waste, J., Kerrigan, J., and Lennon, 'J., concurred.

SEAWELL, J., Dissenting.—I dissent. The indisputable facts of this case are that defendant is a corporation, doing a general, seed and plant business throughout southern California, with its principal place of business at Los Angeles, this state. Plaintiff was engaged in raising for sale in the market of San Diego and vicinity a variety of celery known as the Golden Yellow. Eight acres of his eighteen-acre holding situate at Chula Vista, San Diego County, were devoted to this use. He had been a grower of celery for something like forty years.

On March 16, 1920, through the United States mail, he forwarded from Chula Vista to defendant the following order, written on plain letter paper:

''Germain Seed Company:

''Please send me twenty dollars worth of celery seed, the Golden yellow Cali stock enclosed find money order for same. From the French stock I also have a bal due me for $20 & 10 cents for seed I sold to Brackenhoff. He refers me to you for payment for same. He claims you have taken

over the seed when he sold. Please let me know what I can do about it & oblige. Res.

"Ben Miller,

"Nat. Ave & B St. Chula Vista, Cali."

A second letter was as follows:

"April 8, 1920.

"Germain Seed Co.

"Please send me 12 dollars worth of Celery Seed of French Golden self Bleaching Cali stock, and oblige.

"Ben Miller,

"National & E St. Chula Vista, Cal.

"Inclosed find Money Order for same."

No reply by letter was made by defendant to either of said orders but in response thereto defendant forwarded to plaintiff's address by common carrier two bags of celery seed which were received by him in the due course of transportation. The first order was for the use of plaintiff. The second order was for the ·use of his son, Fred Miller, and Oscar Lehner. Written or printed on the forwarding tags were the words: "Ben Miller. National Avenue at E Street, Chula Vista, California. From Germain Seed and Plant Co., Los Angeles, California." Upon each bag there was stamped the word "Germain," beneath which appeared the words, "Germain Seeds germinate. Seeds. Los Angeles, California." Neither the tags nor the bags·bore any other words or marks.

The seed forwarded was not true to the variety ordered, but was a different and inferior variety known as green celery seed. Relying upon defendant to furnish the variety ordered, and believing that the seed received to be of such variety, plaintiff in good faith planted said seed in beds prepared for that purpose, raising 240,000 plants, 80,000 of which were transplanted in four acres of soil prepared to receive them, and 180,000 of said plants were reserved to be planted later on an additional four acres which also had been prepared for that purpose, but which were not subsequently planted because it became apparent that the plants· were not of the Golden Yellow variety, but were of a worthless variety and possessed no market value whatsoever. Plaintiff suffered a substantial loss. The soil had been fertilized and carefully prepared for celery raising. Considerable care and attention is required to successfully plant, culti-

vate, bleach, and prepare this plant for the market. In addition to the expense of putting the soil in condition to receive the plants, plaintiff sustained the loss of the use of his land for farming or other profitable uses, and his time and labor. He was further damaged by being deprived of the gains which he would have received had the seed been true to variety. It was shown that had the celery seed been of the Golden Yellow variety the acreage sown by plaintiff should have yielded a crop of 75,000 bunches of Golden Yellow celery, which would have brought a return of $1.25 per dozen bunches, but being of a kind that was not marketable, the entire crop was lost. Plaintiff placed his loss at $11,900. The jury returned a verdict in his favor in the sum of $4,000.

The second bag of seed was planted by Oscar Lehner and Fred Miller with like disastrous results. The evidence fully sustained the claim that the Green variety of celery was of no market value while the Golden Yellow was readily marketable and brought a good price. It is admitted that there is no known test by which any one of the several varieties of celery seed may be distinguished from any other variety. The true character of the plant cannot be readily determined until it reaches an advanced stage of development known as the "bleaching period."

Defendant admits that for a period of fifteen years it had supplied plaintiff with celery seed. Also that it knew that plaintiff grew and raised Golden Yellow celery. This admission goes to the point that the defendant had knowledge of the special use that was to be made of the seed, to wit, *planting.* Such knowledge on the part of the seller is a highly important factor and furnishes a very strong reason, as pointed out by the leading authorities on this subject, for the application of the principle of warranty to cases in which the seller, such as here, assumed from the nature of his business, a superior knowledge of the thing sold.

Defendant admits that the celery seed furnished by it to plaintiff was not of the variety ordered and by way of answer alleges that it attempted in good faith to fill said order in compliance with plaintiff's directions and that it believed and had good reason to believe that the seed shipped to plaintiff was Golden Yellow celery seed, and if not of that variety the defendant was ignorant of the fact. By way of

avoidance it is alleged to be the "general established usage· and custom of the seed business in the state of California, and in compliance with and in conformity to its own usage and custom in that behalf, the said defendant inclosed with each package containing said seed a slip upon which was printed the following: 'The Germain Seed and Plant Company gives no warranty, express or implied, as to description, quality, productiveness or any other matter, of seeds, bulbs, plants, or trees they send out and they will not be responsible in any way for the crop. If the purchaser does not accept the goods on these terms they are at once to be returned.' "

Defendant further alleges that for a period of fifteen years prior to the commencement of the action plaintiff had at various times purchased seed from defendant and in each instance there was inclosed in the package containing said seed a slip upon which was printed the notice of non-warranty as above set out. That plaintiff at the time of ordering said Golden Yellow celery seed and at the time of the receipt of the packages containing said seed well knew and was fully advised that it was the established usage and custom of the seed trade in the state of California and also of the defendant not to warrant, expressly or impliedly, any seed as to description, quality or productiveness. The knowledge on the part of plaintiff of the existence of *usage* and *custom* as pleaded was denied by plaintiff, as was the allegation that any such usage or custom prevailed.

The small loose-leaf slips, one of which it is claimed, was inclosed in each bag of seed, contained the following non-warranty notice: "Germain Seeds germinate. The Germain Seed and Plant Company give no warranty, express or implied, as to description, quality, productiveness or any other matter, of seeds, bulbs, plants, or trees they send out and they will not be responsible in any way for the crop. If the purchaser does not accept the goods on these terms they are at once to be returned." The same notice closely printed appears in appellant's elaborate catalogue and was printed on the order-blanks and on other stationery used by it. Respondent denied that he was at all familiar with appellant's catalogues or had ever seen said notice, printed or published, and had no knowledge, either directly or indirectly, of said disclaimer notice. Respondent, his wife, and his son testi-

fied that the seed bags contained no nonwarranty notice or disclaimer and that there was nothing inside the bags except the celery seed, and nothing by way of notice on the outside of the bag or container—the place where the public has become educated to look for directions and instructions—save that which has already been set out. All disputed questions of fact were passed upon adversely to appellant's contention by the jury and finally by the trial court in denying appellant's motion for a new trial. There is sufficient evidence in the record to sustain a finding supporting the contention of respondent on questions of disputed facts and the jury's findings in this respect cannot be disturbed.

In view of the fact that the opinion of the court does not definitely decide—omitting from a consideration of the case all questions of custom—whether or not the main facts of the case which are practically agreed upon constitute a warranty, as that term relates to sales of seed when sold with the knowledge on the part of the seller that they are to be planted by the purchaser, justifies an extended review of the general subject. An apparent distinction is observed by the authorities in cases where seed or grain or corn is bought without a knowledge of the use to be made of it and cases where the seller has knowledge that it is to be planted for a specific purpose of husbandry. In the latter case the rule is given stricter application.

The second distinction, which must also be kept in mind, is the one made by the decisions and text-writers between a warranty as to *kind*—the thing itself—and the *quality* of the thing sold. It is true that the terms "express warranty" and "implied warranty" are frequently loosely used by courts and by text-writers, but in the final analysis a warranty is but what the term implies and the means by which it is established do not create degrees of warranty,—that is to say, one of a higher and another of a lesser degree. The code of this state (sec. 1764, Civ. Code) makes no such distinction and goes no further than to say that a *warranty* is not *implied* (established) except as prescribed by the article defining warranty. This particular subject will hereafter be adverted to.

In addition to the principal authorities cited in the main opinion a few others not directly cited therein, but which are relied upon by appellant, will be noticed. An examina-

tion of the cases cited to support the main opinion and which involve the question of warranty as to *sales of seed,* exclusively, will show that not one rests its decision upon the sole ground that general custom furnished an absolutely satisfactory answer to the claim of warranty. The conclusion in each case consists of a grouping of composite elements. In some of the cases cited to that end it will appear that the purchaser was directly or indirectly chargeable with notice of nonwarranty which was brought to his attention in some form. In others the contract of sale contained a nonwarranty clause or the case showed that the buyer, so far as knowledge of the transaction was concerned (perhaps through agencies), stood on an equal plane or vantage with the seller. In other words, there is to be found in said cases some consideration which differentiates the facts of those cases from the instant case.

The two cases most carefully considered and widely cited in American jurisdictions on the subject of warranty of seed and the seller's liability thereunder and which have been cited by this court with favor are *Wolcott* v. *Mount,* 36 N. J. L. 262 [13 Am. Rep. 438], 38 N. J. L. 496 [20 Am. Rep. 425], and *White* v. *Miller,* 71 N. Y. 118 [27 Am. Rep. 13]. Each is an example of exhaustive research and the soundness of the principles enunciated by their respective authors remain unshaken to this day. The first may be thus stated: Mount, a market gardener, applied to Wolcott & Co., merchants, who kept agricultural and other seed for sale, for "Early strap-leaf red-top turnip seed." Wolcott sold him seed which he said was of that kind and which was bought by Mount as such. Mount informed Wolcott at the time of purchase that he wanted the kind of seed described to raise a crop for the early market. Mount sowed the seed and it turned out to be a different kind of turnip seed of an inferior quality. The representation was made in good faith, Wolcott & Co. having purchased the seed as "early strap-leaf red-top" turnip seed. In an action by Mount for a breach of warranty it was held that the question whether the statements made by Wolcott were merely an expression of opinion or a warranty was one of fact in the court below, and the evidence tending to show that a warranty was made, the finding could not be reviewed. The measure of damages was there held, as it is in this state, to

be the difference between the value of the market crop raised and the same crop from the seed ordered. The seed sold to Mount by Wolcott was sown upon ground which he had prepared with care and at great expense for the purpose. He had been in the habit, year after year, to sow early strap-leaf red-top turnip seed to produce turnips for the early New York market, such kind and description of turnips yielding a large profit and at the time of purchase he stated that he wished this description and kind of seed for that purpose. The turnips produced from the seed purchased and sown were not early strap-leaf red-top turnips but of a kind and description not salable and fit only for cattle feed, and his entire crop was lost. It was agreed that Wolcott did not know that the seed sold was not the kind ordered and no fraud is charged in the transaction. It was also agreed that the kind of turnip seed attempted to be purchased could not be known or distinguished by examination through sight or touch from other kinds but only by the kind of turnips it produced after sowing. It is a case in all respects applicable to the facts of the instant case. The close resemblance of the facts of that case with the case at bar and its able and excellent review of our earlier American and English cases is a sufficient justification for the extended quotation, which follows:

"In the well-known case of *Chandelor* v. *Lopus,* Cro. Jac. 4, it was decided that a bare affirmation that a stone sold was a bezoar stone, when it was not, was no cause of action.

"The cases cited fairly present the negative of the proposition on which the plaintiff's right of action depends. *Chandelor* v. *Lopus* was decided on the distinction between actions on the case *in tort* for a misrepresentation, in which a scienter must be averred and proved and actions upon the contract of warranty. 1 Smith's Lead. Cas. 283. Chancellor Kent, who delivered the opinion in *Seaxias* v. *Woods,* in his Commentaries expresses a doubt whether the maxim, *caveat emptor,* was correctly applied in that case, inasmuch as there was a description in writing of the article sold, from which a warranty might have been inferred. 2 Kent, 479. And in a recent case before the commission of appeals of New York, Earl, C., declared that *Seixas* v. *Woods* had been much questioned and could no longer be regarded as

authority on the precise point. *Hawkins* v. *Pemberton,* 51
N. Y. 204. In the later English cases some criticism has
been made upon the application of the term 'warranty' to
representations in contracts of sale, descriptive of articles
which are known in the market by such description, per Lord
Abinger in *Chanter* v. *Hopkins,* 4 M. & W. 404; per Erle,
C. J., in *Bannerman* v. *White,* 10 C. B. (N. S.) 844. But
in a number of instances it has been held that statements
descriptive of the subject-matter, if intended as a substan-
tive part of the contract, will be regarded in the first in-
stance as conditions, on the failure of which the other party
may repudiate *in toto,* by a refusal to accept or a return of
the article, if that be practicable, or if part of the considera-
tion has been received, and rescission therefor has become
impossible, such representations change their character as
conditions and become warranties, for the breach of which
an action will lie to recover damages. The rule of law is
thus stated by Williams, J., in *Behn* v. *Burness* as estab-
lished on principle and sustained by authority, 3 B. & S.
755.

"In *Bridge* v. *Wain,* 1 Starkie, 504, no special warranty
was proved, but the goods were described as scarlet cuttings,
an article known in the market as peculiar in the China
trade. In an action for breach of warranty, Lord Ellen-
borough held that if the goods were sold by the name of
scarlet cuttings, and were so described in the invoice, an
undertaking that they were such must be inferred. In
*Allan* v. *Lake,* 18 Q. B. 560, the defendant sold to the plain-
tiff a crop of turnips, described in the sold note as Skirving's
Sweedes. The seed having been sown, it turned out that the
greater part was not of that kind, but of an inferior kind.
It was held that the statement that the seeds were Skir-
ving's Sweedes was a description of a known article of trade
and a warranty. In *Josling* v. *Kingsfold,* 13 C. B. (N. S.)
447, the purchaser recovered damages upon a contract for
the sale of oxalic acid, where the jury found that the article
delivered did not, in a commercial sense, come properly
within the description of oxalic acid, though the vendor was
not the manufacturer, and the vendee had an opportunity
of inspection (the defect not being discoverable by inspec-
tion), and no fraud was suggested. In *Wieler* v. *Schillizzi,*
17 C. B. 619, the sale was of 'Calcutta linseed.' The goods

had been delivered, and the action was in form on the warranty implied from the description. The jury having found that the article delivered had lost its distinctive character as Calcutta linseed, by reason of the admixture of a foreign substance, the plaintiff recovered his damages upon the warranty.

"The doctrine that on the sale of a chattel as being of a particular kind or description, a contract is implied that the article sold is of that kind or description, is also sustained by the following English cases: *Powell* v. *Horton,* 2 Bing. N. S. 668; *Barr* v. *Gibson,* 3 M. & W. 390; *Chanter* v. *Hopkins,* 4 id. 399; *Nichol* v. *Godts,* 10 Exch. 191; *Gompertz* v. *Bartlett,* 2 E. & B. 849; *Azemar* v. *Casella,* Law Rep., 2 C. P. 431, 677; and has been approved by some decisions in the courts of this country. *Henshaw* v. *Robbins,* 9 Metc. 83; *Borrekins* v. *Bevan,* 3 Rawle, 23; *Osgood* v. *Lewis,* 2 Har. & Gill, 495; *Hawkins* v. *Pemberton,* 51 N. Y. 198 [10 Am. Rep. 595].

"The right to repudiate the purchase for the non-conformity of the article delivered, to the description under which it was sold is universally conceded. That right is founded on the engagement of the vendor, by such description that the article delivered shall correspond with the description. The obligation rests upon the contract. Substantially, the description is warranted. It will comport with sound legal principles to treat such engagements as conditions in order to afford the purchaser a more enlarged remedy, by rescission, than he would have on a simple warranty; but when his situation has been changed, and the remedy, by repudiation, has become impossible, no reason, supported by principle, can be adduced why he should not have upon his contract such redress as is practicable under the circumstances. In that situation of affairs the only available means of redress is by an action for damages. Whether the action shall be technically considered an action on a warranty, or an action for the non-performance of a contract, is entirely immaterial.

"The contract which arises from the description of an article on a sale by a dealer not being the manufacturer, is not in all respects co-extensive with that which is sometimes implied, where the vendor is the manufacturer, and the goods are ordered by a particular description, or for a

specified purpose, without opportunity for inspection, in which case, a warranty, under some circumstances, is implied that the goods shall be merchantable, or reasonably fit for the purpose for which they were ordered. In general, the only contract which arises on the sale of an article by a description, by its known designation in the market, is that it is of the kind specified. If the article corresponds with that description, no warranty is implied that it shall answer the particular purpose in view of which the purchase was made. *Chanter* v. *Hopkins,* 4 M. & W. 414; *Olivant* v. *Bayley,* 5 Q. B. 288; *Windsor* v. *Lombard,* 18. Peck. (Mass.) 55; *Mixer* v. *Coburn,* 11 Metc. (Mass.) 559; *Gossler* v. *Eagle etc. Co.,* 103 Mass. 331. The cases on this subject, so productive of judicial discussion, are classified by Justice Mellor, in *Jones* v. *Just,* Law Rep. 3 Q. B. 197. Nor can any distinction be maintained between statements of this character in written and in oral contracts. The arguments founded on an apprehension that where the contract is oral, loose expression of judgment or opinion pending the negotiations might be regarded as embodied in the contract, contrary to the intention of parties, is without reasonable foundation. It is always a question of construction or of fact, whether such statements were the expression of a mere matter of opinion, or were intended to be a substantive part of the contract when concluded. If the contract is in writing, the question is one of construction for the court. *Behn* v. *Burmiss,* 3 B. & S. 751. If it be concluded by parol, it will be for the determination of the jury, from the nature of the sale, and the circumstances of each particular case, whether the language used was an expression of opinion, merely leaving the buyer to exercise his own judgment, or whether it was intended and understood to be an undertaking which was a contract on the part of the seller. *Lomi* v. *Tucker,* 4 C. & P. 15; *De Sewhanberg* v. *Buchanan,* 5 id. 343; *Power* v. *Barham,* 4 A. & E. 473. In the case last cited, the vendor sold by a bill of parcel, 'four pictures, views in Venice-Canaletto'; it was held that it was for the jury to say, under all circumstances, what was the effect of the words, and whether they implied a warranty of genuineness, or conveyed only a description or an expression of opinion, and that the bill of parcels was properly laid before the jury with the rest of the evidence.

"The purchaser may contract for a specific article, as well as for a particular quality, and if the seller makes such a contract, he is bound by it. The state of the case presented shows that the plaintiff inquired for seed for a designated kind, and informed the defendants that he wanted to raise a crop for the New York market. The defendants showed him the seed, and told him it was the kind he inquired for, and sold it to him as such. The inspection and examination of the seed were of no service to the plaintiff. The facts and circumstances attending the transaction were before the court below, and from the evidence, it decided that the proof was sufficient to establish a contract of warranty. The evidence tended to support that conclusion, and this court cannot, on *certiorari*, review the finding of the court below, on a question of fact, where there is evidence from which the conclusion arrived at may be lawfully inferred."

The case of *White* v. *Miller*, 71 N. Y. 118, is equally direct to the issue of warranty. The question was whether there had been a warranty by the defendants that the seed sold to plaintiff was "genuine large Bristol cabbage seed." The facts follow: "The defendants were growers of garden seed for sale, and the plaintiffs were market gardeners raising vegetables for sale in the market. In 1867 they bought of the defendants cabbage seed of the variety known as large Bristol cabbage seed, which produced Bristol cabbage. In the fall of 1867, Miller, one of the trustees of the defendants, informed the plaintiffs that they had raised that year 200 pounds of Bristol cabbage seed, like that the plaintiffs had had, and solicited them to come early if they wished any." The defendants knew that plaintiffs were market gardeners and desired a particular variety of seed that would produce Bristol cabbages which were a valuable variety for market. The plaintiffs in making the purchase of said seed went to the store of the defendants following the conversation above related and on making known their business to the defendants' clerk the latter produced a printed catalogue of the seeds the defendants had for sale and exhibited it to the plaintiffs; among the seeds in the list was large Bristol cabbage seed. Plaintiffs then ordered, among other seed, six pounds of Bristol cabbage seed. Some days afterward the seed was delivered at a store for plaintiffs.

In the bill the cabbage seed was described as six pounds large cabbage seed.

It is true that the opinion states that the "grower of seeds must be presumed to be cognizant of any omissions or negligence in cultivation, whereby they have been deteriorated or rendered unfit for use," but the decision nevertheless is placed upon the general principle that a bargain and sale of a chattel of a particular description imports a contract of warranty that the article sold is of that description and it matters not whether it be an article manufactured by another than the seller or whether it be seed sold by one who was not the grower. The authorities cited in the opinion support this view. It is there said:

"The doctrine that a bargain and sale of a chattel of a particular description imports a contract of warranty that the article sold is of that description, is sustained by a great weight of judicial authority. The cases of *Seixas* v. *Wood,* (2 Caines, 48), and *Smith* v. *Colgate* (20 Johns. (N. Y.) 196), based mainly upon the authority of the case of *Chandelor* v. *Lopus* (Cro. 1, 4), are, it must be admitted, adverse to this view. The case of *Chandelor* v. *Lopus* has been overruled in England, and the cases in this state referred to have been often questioned, and Chancellor Kent, who took part in deciding *Seixas* v. *Wood,* intimates in his commentaries a doubt whether the case was correctly decided. (2 Kent, 479.) The case of *Hawkins* v. *Pemberton* (51 N. Y. 198 [10 Am. Rep. 595]), adopts, as the law in this state, the doctrine upon this subject now prevailing elsewhere, that a sale of a chattel by a particular description, is a warranty that the article sold is of the kind specified; and this case was recognized in *Dounce* v. *Dow* (64 N. Y. 411), as modifying the doctrine of *Seixas* v. *Wood* and *Swett* v. *Colgate.* We think the modern doctrine upon the subject is reasonable, and proceeds upon a just interpretation of the contract of sale. A dealer who sells an article, describing it by the name of the article of commerce, the identity of which is not known to the purchaser, must understand that the latter relies upon the description as a representation by the seller that it is the thing described; and this constitutes a warranty. We content ourselves without further argument, with referring to some of the cases bearing upon this question, which must, we think, be regarded

as decisive. (*Barr* v. *Gibson,* 3 M. & W. 390; *Budge* v. *Main,* 1 Har. 505; *Shepherd* v. *Kain,* 5 B. & Ald. 210; *Baker* v. *Barness,* 3 B. & S. 749; *Allan* v. *Lake,* 18 Ad. & El. [N. S.] 561; *Power* v. *Barbour,* Ad. & El. 473; *Bomerkin* v. *Bevan,* 3 S. & R. 37; *Henshaw* v. *Robbins,* 9 Met. 83; *Hawkins* v. *Pemberton, supra.*)

"The referee was, therefore, justified in finding that the defendants warranted the seed sold to the plaintiffs to be large Bristol cabbage seed, from the fact that the plaintiffs applied to purchase that description of seed; and that the seed delivered was designated in the bill of parcels as large Bristol cabbage seed. . . . Aside from the warranty raised in this case by the description in the bill of parcels, there was, also, upon the sale in question, within the authority of *Hoe* v. *Sanborn* (21 N. Y. 552), a warranty implied by law, that the seed sold were free from any latent defect arising from the mode of cultivation. It was decided in *Hoe* v. *Sanborn,* that upon a sale of a chattel by a manufacturer, a warranty is implied that the article is free from any latent defect growing out of the process of manufacture. The rule is based on the presumed superior knowledge of the vendor; and there seems to be the same reason for implying a warranty on a sale of seeds by the grower, that they are not defective from improper cultivation, as to imply a warranty of freedom from defects in the manufacture, on a sale by a manufacturer of the article made by him. The grower of seeds must be presumed to be cognizant of any omissions or negligence in cultivation, whereby they have been deteriorated or rendered unfit for use."

In this case it will be observed that Miller was not only the seller of the seed, but also had raised it. The seed was grown upon Bristol cabbage stocks, but the stocks had been planted in the vicinity of stocks of other varieties of cabbage, had become fertilized by the pollen therefrom, and in consequence of the crossing of the varieties, the seed grown upon the Bristol cabbage stock became hybridized and were not genuine Bristol cabbage seed, but had lost their character and quality and the plants raised by the plaintiff from the seed purchased from defendants in consequence of such crossing were of no known variety of cabbage and were of no value except as food for cattle. The misfortune of the situa-

tion was not deemed sufficient to relieve defendants of the obligation of their warranty.

In the footnote to the case of *Meehan* v. *Ingals,* 91 Wash. 86 [Ann. Cas. 1918B, 71, 75, 157 Pac. 217], it is said: "The courts are not altogether agreed as to whether the warranty which results from the furnishing of seed in response to a request for a particular variety is express or implied. The weight of authority is, however, that in any sale of seed specifically designated by name or variety the seller warrants that it is in fact of the kind or variety indicated." (See *Sanford* v. *Brown Bros.,* 208 N. Y. 90 [50 L. R. A. (N. S.) 778, 101 N. E. 797]; *Jones* v. *George,* 61 Tex. 345 [48 Am. Rep. 280]; *Cline* v. *Mock,* 150 Mo. App. 431 [131 S. W. 710]; *Edgar* v. *Brick & Sons Corp.,* 172 Mass. 581 [52 N. E. 1083], [opinion by Mr. Justice Holmes].)

Another judicial landmark in this country as to what words or acts amount to an express warranty in this class of cases is *Hoffman* v. *Dixon,* 105 Wis. 315 [76 Am. St. Rep. 916, 81 N. W. 491]. This is one of the leading cases on the subject and is known in the books as the "rape seed case." The facts were: The plaintiff, a farmer, sent his son to defendant's store to purchase rape seed. The merchant kept seed for sale. The son asked the clerk if they had rape seed for sale and the latter replied that they had and weighed out the amount desired. Neither the son, the clerk, the defendant, nor the plaintiff knew rape seed from wild mustard seed, which the article sold proved to be, and each was wholly unaware of the ignorance of the others. The son, relying upon the fact that the seed sold to him was what he called for; the plaintiff planted the seed, relying upon the fact that it was sold as rape seed. The wild mustard seed fouled plaintiff's lands to his injury. A nonsuit was granted and the supreme court of Wisconsin reversed it. A very thorough and interesting review is made of the many authorities bearing on the subject. We quote from the closing portion of the opinion:

"With but few exceptions, which we shall not take time or space to refer to specifically, the judicial authorities and the text-writers as well are in harmony with the foregoing. Biddle, Warranties, sec. 108. That rule is just. It holds a dealer responsible for breach of contract when he sells a thing as being of a particular kind, if it does not answer

the description, the vendee not knowing whether the vendor's representations are true or false, but relying upon them as true.   There is no good reason why a dealer should be permitted to exhibit seed to his customers, asserting it to be rape seed when it is something else, and then protect himself from the consequences of his falsehood by a plea of ignorance.   The injury by the deception is just as great whether it be willful or innocent.   The customer has the same right to rely upon the representation in the one case as in the other.   Knowledge on the part of the vendor is not essential either to actionable fraud or a contract of warranty. "Applying the principle stated to the facts of this case, what was the contract between the parties? Upon what did their minds meet?   The answer must be, that the defendant would sell to the plaintiff rape seed and that the seed delivered was of that kind.   Opportunity on the part of the plaintiff to inspect does not militate against his right to insist upon the condition of the contract as to the identity of the article delivered being made good, since he relied wholly on his contract, not knowing whether the article he received answered such condition or not, and not being chargeable with negligence because he did not know.   In such a case the doctrine of *implied warranty* does not apply, but the doctrine of *express warranty does.*   No particular form of expression or words is necessary to make an express contract of warranty.   The word 'warranty' is not necessary to it.   An affirmation of the fact as to the kind or quality of an article offered for sale, of which the vendee is ignorant, but upon which he relies in purchasing such article, is as much a binding contract of warranty as a formal agreement using the plainest and most unequivocal language on the subject.   In Benjamin on Sales (6th ed.), 623, 625, as conclusions from a review of authorities in this country and England, including the New York cases overruling *Seixas* v. *Woods,* it is said: 'All agree that any positive affirmation of a material fact as a fact, intended by the vendor as and for a warranty, and relied upon as such, is sufficient' to constitute a warranty.   'The better class of cases hold that a positive affirmation of a material fact as a fact, intended to be relied upon as such and which is so relied upon, constitutes in law a warranty, whether the vendor mentally intended to warrant or not.'   The latter is

the doctrine of this court, as indicated by numerous cases where it has been applied. *Austin* v. *Nikerson*, 21 Wis. 549; *Giffert* v. *West*, 33 Wis. 617; *Neave* v. *Arntz*, 56 Wis. 174 [14 N. W. 41]; *White* v. *Stelloh*, 74 Wis. 435 [43 N. W. 99].

"It follows from the foregoing that the decision of the trial court that the doctrine of *caveat emptor* applies to the facts of this case, and that the evidence does not justify a finding that the defendant warranted the seed to plaintiff to be rape seed and that he was entitled to recover for a breach of it, was erroneous, and the nonsuit was improperly granted." (Italics ours.)

Mr. Williston, in his work on Sales, at page 224, says: "In the early English law it is probable that all warranties were collateral in form, but in the early English law promises implied in fact were not recognized and the doctrine of *caveat emptor* was carried so far that unless the seller expressly said that he warranted the goods there was no obligation imposed upon him in regard to their quality. In the nature of the case, therefore, the seller had to make a separate and distinct promise; that is, a promise collateral in form. At the present day, however, it is clear in England and elsewhere that a promise need not be collateral in form in order to constitute a warranty. When A contracts to sell B a sound horse, there is no collateral promise. Yet if A delivers to B an unsound horse and B takes title to him, A is a warrantor of the horse's soundness with precisely the same consequences as if he had sold the horse with a separate statement, 'I warrant him sound.' Further, it may be supposed that specified goods are sold in compliance with an order describing the goods desired. A buyer asks for 'strap-leaf. red-top turnip seed' or 'large Bristol cabbage seed' or 'rape seed' or bulbs of a named variety. No agreement to sell precedes the actual sale, but when the seller furnishes goods, he is said to warrant that the goods are of the kind asked for, yet the description is not collateral in form."

Mr. Benjamin in his work on Sales, seventh edition, 611, under the chapter of *express warranty*, quotes from *Pasley* v. *Freeman*, 3 Term Rep. 51, the following: "It was rightly held by Holt, C. J., and has been uniformly adopted ever since, that an affirmation at the time of a sale is a warranty,

providing it appear in evidence to have been so intended."
Continuing, he says: "And in determining whether it was
so intended, a decisive test is, whether the vendor assumes
to *assert a fact* of which the buyer is ignorant, or merely
states an opinion or judgment upon a matter of which the
vendor has no special knowledge, and on which the buyer
may be expected also to have an opinion, and to exercise his
judgment. In the former case there is a warranty, in the
latter not. . . . In relation to express warranties, the rules
for interpreting them do not differ from those applied to
other contracts. The intention of the parties is sought and
carried into effect, and in some cases, even where the alleged
warranty was expressed in writing, it has been left to the
jury to say whether the intention of the parties was that the
representation or affirmation should constitute a warranty
or not, for *simplex commendatio non obligata.*"

The more recent cases hold that a positive affirmation
understood and relied upon as such by the vendee is an ex-
press warranty. (*Fairbanks Canning Co.* v. *Metzger et al.,*
118 N. Y. 260, 265 [16 Am. St. Rep. 753, 23 N. E. 372].
See, also, *Gubner* v. *Vick,* 42 Hun, 657 [6 N. Y. St. Rep. 4].)

Appellant cites a line of cases to the effect that personal
property may be sold with or without warranty. This point
is conceded. An examination, however, of the cases cited by
appellant to sustain the contention that the rule of *caveat
emptor* applies to the case at bar will show that in practi-
cally every one there exists some fact or condition which
clearly distinguishes the instant case from those cited. We
will briefly refer to a few of them.

In *Leonard Seed Co.* v. *Crary Canning Co.,* 147 Wis.
166 [Ann. Cas. 1912D, 1077, 37 L. R. A. (N. S.) 79, 132
N. W. 902], plaintiff agreed to sell defendant a certain vari-
ety of peas. Among other things plaintiff agreed to fur-
nish a thousand bushels of "Advancer" peas and guaranteed
seventy-five per cent delivery. Said peas were to be grown
during the season of 1909. The peas were sold by defend-
ant to farmers for the purpose of planting under contracts
by virtue of which the farmer agreed to sell the peas raised
from such seed to defendant. Defendant had given its
promissory notes in payment for the seed. Plaintiff brought
an action upon said notes. Defendant interposed a counter-
claim that said peas were not "Advancer" peas and were

received without knowledge of that fact and that there was no means of discovering that they were not "Advancer" peas until the seed had germinated. The *contract of sale* of the peas contained a *provision of nonwarranty* very similar to the provision which it is alleged in the instant case was printed on a slip and inclosed in each bag of celery seed. The court held in that case that a dealer could by contract exempt itself from warranty.

In *Seattle Seed Co.* v. *A. Fujimori,* 79 Wash. 123 [139 Pac. 866], it was held that the sale and delivery of "Alaska" or "Early Alaska" garden pea seed was made subject to the printed condition contained in the seed bag which the trial court found to be a condition of the sale. There was also in the record evidence that "a general custom prevailed in the seed trade of making all sales subject to the conditions named on the printed slips." The court said: "This, coupled with the evidence that the printed slips were *placed in each bag of seed* is sufficient to support the finding that the sale was made without warranty or condition, and warranty or condition that the seed was true to name could not be inferred," citing as authority *Leonard Seed Co.* v. *Crary Canning Co., supra,* and *Blizzard Bros.* v. *Growers' C. Co.,* 152 Iowa, 257 [132 N. W. 66]. It would seem from the quoted language that neither one of the two elements standing alone was quite sufficient to support the court's conclusion.

In *Blizzard Bros.* v. *Growers' C. Co., supra,* the plaintiff entered into a contract with the defendant "to plant and properly cultivate three acres of pumpkins, all of which they agreed to deliver to the factory of said company in good condition for canning purposes." The seed was to be furnished to the growers by the company. *No particular variety of seed was named.* The company being out of pumpkin seed inquired of the Younkerman Seed Company if it had the large cheese pumpkin seed and was informed that it had. Blizzard Bros. were directed to said seed-house and inquired if a package of large pumpkin seed was there for them. A clerk of the company responded in the affirmative and handed them a pound package on which was written "Large cheese pumpkin seed." The seed was planted but proved to be of an inferior pumpkin and the canning company refused to accept them. Suit was filed against the can-

ning company and the seed company was made a party defendant. The canning company denied liability and in a cross-petition alleged the fault to be that of the seed company and prayed for such judgment against it as might be entered against the cross-petitioner. The seed company pleaded that it was the general custom of dealers in seed to sell with disclaimer as to quality or whether true to name, and on all packages there was *customarily printed* a non-warranty notice similar to the notice brought to our attention in the instant case. It is there said: "The evidence that a general custom, such as pleaded, prevails in the seed trade was conclusive. The particular package had the printed matter thereon (nonwarranty notice), and though this may not have been noticed, the sale is presumed to have been negotiated with reference to the general custom of the trade." Three Iowa cases are cited, two of which deal with mining customs. The court held, however, that inasmuch as the canning company undertook to furnish seed of *no specific kind,* but such as was suitable for canning purposes the clear implication was that the seed furnished should have been such as would produce that *quality* of pumpkin. It will be borne in mind that the contract out of which the suit sprang was as to *quality* and not as to *variety.* In fact, the contract between plaintiff and defendant called only for *any variety* of pumpkin seed suitable for canning purposes. The case cited under its own peculiar facts is not authority against the principle contended for by appellant in the instant case.

Perhaps as strong a case as can be found in appellant's favor and upon which much reliance is placed is *Ross* v. *Northrup, King & Co.,* 156 Wis. 327 [144 N. W. 1124]: The principle there announced is, in the main, essentially in line with the Walcott, Miller and other approved authority. It expressly recognizes the rule to be, leaving any question of custom out of consideration, that where a certain variety of seed is called for and is furnished in response to such call, there is a warranty that it is true to description unless the seller advises the purchaser that the sale is made without warranty. The facts stated are entirely different from the facts of the instant case. There the seed was ordered from the printed catalogue, upon a printed blank order sheet, upon each of which was printed a disclaimer of warranty, and upon

one side of the shipping tag attached to the bag of seed was conspicuously printed in red letters a specific refusal to warrant as to description, quality, productiveness, etc. In addition to this the invoice contained a statement similar to that in the catalogue as to nonwarranty. There was convincing evidence to show that a disclaimer or nonwarranty was printed on the bag containing the tobacco seed also. Here the facts are altogether different. The seed was not ordered from a printed catalogue nor was the order given upon a blank order sheet containing a nonwarranty or disclaimer notice. On the contrary, the bag containing the seed bore the suggestive words. "Germain seeds germinate." The court, after disposing of the question that was fully determinative of the case, to wit, that the sale was made without warranty by reason of the circumstances above related, proceeds to discuss the special finding of the jury and holds that at the time of the sale there was "a general custom in the Northwest, including Wisconsin, among seedsmen such as defendant, to refuse to warrant seeds," and holds that the evidence was sufficient to warrant the finding by the jury of a general custom. The plaintiff's agent, who was held to have been charged with knowledge of general custom, was a seller of seeds. The Leonard seed case and the Blizzard case are cited as authorities, and, strange as it may appear, the case of *Hoffman* v. *Dixon, supra,* is also cited with approval. The latter is a leading case, to the effect that where a certain variety of seed is called for and purchased in response to such call that this constitutes not an *implied* warranty but an *express warranty.* The economical reasons which received the attention of the court in the case of *Ross* v. *Northrup* are by no means persuasive, as surely sounder reasons resting upon economical grounds could be stated in behalf of the claim of the planter and producer than any that may be advanced in favor of the seller of seed.

The case of *Kircher* v. *Conrad,* 9 Mont. 191 [18 Am. St. Rep. 731, 7 L. R. A. 471, 23 Pac. 74], is inapplicable to the facts before us. It is not a case in point. But the law, as stated by the supreme court of the state of Montana, in *Keller* v. *Green,* 51 Mont. 42 [149 Pac. 286], decided later, is important to a consideration of the instant case. It is there said that it is the duty of the seller to know that the wheat which he sold was of the character represented and

if it was not the responsibility is the seller's in the absence of an acceptance with knowledge by the buyer. (Citing *Wolcott* v. *Mount, supra; Hoffman* v. *Dixon, supra.*)

*Lord* v. *Grow,* 39 Pa. St. 88 [80 Am. Dec. 504], is a case of a sale of wheat. The tendency of the modern cases to the doctrine that in sales of articles in regard to which the seller is presumed to have superior knowledge is a warranty that the thing sold shall be of the kind which it is represented to be is there recognized. The opinion states that neither the contract of sale nor the identity of the article was defined by a bill of parcels. Nor was the subject of the contract a manufactured article ordered and supplied for a particular purpose. The buyer insisted on seeing and actually inspected the wheat. The court, observing that the difference between spring wheat and other wheat is not ascertainable by inspection, holds that the case is one of a purchase by inspection of an article of which the vendor's means of knowledge were no greater than those of the vendee and the rule of *caveat emptor* applied. This case is out of line with the greater array of authorities and has not escaped the criticism of Mr. Biddle on Warranties, section 125, and the American editor of Benjamin on Sales, 6th Am. ed., 843, note 23. *Shisler* v. *Baxter,* 109 Pa. St. 443 [58 Am. Rep. 738], follows *Lord* v. *Grow, supra. Kingsbury* v. *Taylor,* 29 Me. 508 [50 Am. Dec. 60], rests upon the doctrine announced in *Chandelor* v. *Lopus, Sexias* v. *Woods, Snell* v. *Moses, supra,* which hold that the vendor of personal property is not liable for defects of any kind, in the thing sold, unless there is express warranty or fraud of the seller, which doctrine was later repudiated in *Miller* v. *White, Wolcott* v. *Mount, supra,* and numerous other cases which followed.

This court has kept in line with the courts generally throughout the nation by recognizing the rule as stated in *Wolcott* v. *Mount, supra,* and *White* v. *Miller, supra,* in practically every instance in which it has been called upon to express itself upon the subject. A few of the authorities applicable to the specific subject are: *Flint* v. *Lyon,* 4 Cal. 17; *McLennon* v. *Ohmen,* 75 Cal. 558 [17 Pac. 687]; *Shearer* v. *Park Nursery Co.,* 103 Cal. 415 [42 Am. St. Rep. 125, 37 Pac. 412]; *Rauth* v. *Southwest Warehouse Co.,* 158 Cal. 54 [109 Pac. 839]; *Moody* v. *Peirano,* 4 Cal. App. 411 [88

Pac. 380]; *Newhall* v. *Hogue-Kellogg Co.,* 56 Cal. App. 90 [204 Pac. 562].

In the very recent case last above cited Mr. Justice Kerrigan, upon a review of the authorities of this and other states, correctly stated the rule in the following language: "Where an article of a particular variety or type is ordered by name and the seller purports to furnish the same, with or without any express statement that the article furnished is of the kind ordered, a warranty of the identity of the variety or kind arises."

It is conceded that the case of *Nicoletti* v. *Bank of Los Banos,* 190 Cal. 637 [27 A. L. R. 1479, 214 Pac. 51], is all that is claimed for it. It is not to be assumed that this court is willing to apply the rule there announced to every situation that may be presented. That case speaks for itself and must make its own defense. The subject matter of that case is wholly foreign to and different from the subject matter of the instant case. The Nicoletti case dealt with a business almost as ancient as civilization itself and with which every citizen, however impecunious he may be or however limited may have been his business sphere, has had some experience. Banking is a universal business. It is regulated by the laws of the land and there is scarcely issued a publication of any sort which does not discuss some feature of the banking system. Here we have an alleged trade usage prevailing among growers and sellers of seed who, it is claimed, as between themselves, have agreed not to warrant the kind of seed sold, the essence of the contract itself. Appellant offered evidence in the court below to prove what it contends to be a general custom prevailing among dealers and growers of seed not to warrant the kind of seed sold. A number of seed sellers and growers, members of the American Seed Trade Association, a protective organization, testified that such was their custom. A number of catalogues of seedsmen of various states were received in evidence. For years it has been the purpose of the seed trade under the direction of the American Seed Trade Association to create a trade custom which would have the effect of contravening the ordinary contract of sale and protect its members from liability as to the kind of seed or plants sold. No member of the public not interested in the sale of seed was called upon to testify as to his knowledge of the

existence of any trade custom for the reason that it is highly probable that he would have had no knowledge whatsoever on the subject.   The rule is in such cases that the public is not chargeable with knowledge of general usage applicable only to a particular business or profession or protective organization and that such a usage cannot be proved against a layman by showing a rule adopted within a particular business or profession only. (*Laver* v. *Hotaling,* 5 Cal. Unrep. 534 [46 Pac. 1070].)   There is nothing better offered in this case to establish a general custom than trade catalogues of dealers, small slips placed inside of seed bags, printed notices on private letter and bill heads and possibly one or two other similar methods of conveying notice to the public. From such a class of evidence it cannot be claimed that a usage or custom has been established of such universality and notoriety as to justify a court in taking judicial cognizance of it as such.   Appellant therefore was called upon to prove that respondent had actual knowledge of the existence of the usage or that it was made to appear from the evidence that it was so general and notorious that knowledge of it will be imputed to him as a matter of law.   In both there is a failure of evidence to justify such a conclusion.   As a matter of law the evidence was insufficient to justify the court in holding that the custom was so universal as to imply knowledge and the jury having found under proper instructions that respondent had no knowledge of such usage no injury was done by the refusal to give the requested instructions.

In *Powell* v. *Thompson,* 80 Ala. 51, noted also in 17 C. J. 495, it is pertinently said: "The tendency of modern authorities is strongly against the loose policy of the English courts, as manifested in their decisions, admitting inconclusive facts in proof of local usage and thereby contradicting the necessary · implications of written agreements under the pretext of annexing incidents. *Thompson* v. *Riggs,* 5 Wall. 663 [18 L. Ed. 704, see, also, Rose's U. S. Notes]; *Brown* v. *Foster,* 113 Mass. 136 [18 Am. Rep. 463]."

In *Strong* v. *Grand Trunk R. Co.,* 15 Mich. 205 [93 Am. Dec. 184], 17 C. J. 496, Judge Cooley said: "Special customs are so liable to create confusion in directions not contemplated in their adoption, that they are admitted into the law with great reluctance; and it is not often a hardship to

parties to reject a custom, so long as they are left free to make their own bargains, and can incorporate it in their contracts if they see fit to do so.''

Mr. Justice Story in *Donnell et al.* v. *Columbian Ins. Co.*, 7 Fed. Cas. No. 3987, 2 Sum. 366, remarked: ''I am among those judges who think usages among merchants should be very sparingly adopted as rules of law by courts of justice, as they are often founded in mere mistake and still more often in the want of enlarged and comprehensive views of the full bearing of principles.''

It is conceded that custom must yield to a written contract or to an expressed oral warranty. The following quotation from *McLennan* v. *Ohman, supra,* seems to be regarded as placing an insurmountable obstruction in the way of respondent's cause: ''To create an express warranty the word 'warranty' need not be used, nor are any particular words necessary. Any affirmation made at the time of the sale as to the *quality* or *condition* of the thing sold will be treated as a warranty if it was so intended and the purchaser bought on the faith of such affirmation.'' (Italics ours.) It is also the law that representations made by a vendor may be sufficient to create a warranty if the vendee so understood them and acted upon them whether the vendor intended such representations to be a warranty or not. (*Hawkins* v. *Pemberton*, 51 N. Y. 198 [10 Am. Rep. 595].) The issue here is not as to *quality* or *condition,* but is whether appellant furnished the specific variety of seed ordered and paid for by respondent. It is not a question whether the seed was a good or bad quality or whether it was in good or poor condition, but rather did appellant furnish the specific thing which respondent sought to buy. There is but one answer to the question. No distinction is recognized by the main opinion between a transaction in which a purchaser is led into the belief that he is buying grain and is in fact sold tares and one involving the simple question of good or bad quality of a designated commodity.

The tendency of the main opinion is to place the laboring oar throughout the entire transaction and in every phase of it in the hands of respondent, as is illustrated by the assumption as to how appellant would have conducted itself under the following test: ''It is clear that if the purchaser had inquired of the seller whether or not it would warrant the

character of the seed that the seller would have replied in the negative.'' It is inconceivable that respondent would have assumed the risk of incurring such losses in preparing and fertilizing his land, and also in labor, time, use of his land and profits of anticipated crops which he has in fact sustained if he had not been made to feel secure by the assurances of the seller which the relations of the contracting parties inspired that he had been furnished the thing which he had in writing contracted for. The purchase money for the seed was retained and a bag containing the seed was sent with an assurance written upon the bag that ''Germain seeds germinate.'' The planting of the seed was the natural result of the transaction. The response of appellant cannot be set aside as being without meaning or significance. If it did not intend to convey any assurance whatever to respondent that the thing sent was the thing purchased or was not willing that it should be so understood or if it entertained doubt in the matter its duty unquestionably was to have replied to respondent's letter informing him that it did not warrant its seed. Where the circumstances are such as amount to a representation of fact on the part of the vendor that an article sold is of a particular kind or description, as, for instance, where the buyer in terms asks for a particular kind and the seller purports to comply with his request he warrants the article as being of that kind, although he may not have made any declaration in words to that effect. (*Firth et al.* v. *Richter,* 49 Cal. App. 545 [196 Pac. 277].)

Under the title of ''Warranty'' the term is defined by section 1763 of the Civil Code to be ''an engagement by which a seller assures to a buyer the existence of some fact affecting the transaction, whether past, present or future.'' ''Assure'' is thus defined by the Standard Dictionary: ''To offer assurances to; endeavor to impart conviction to; to assert something earnestly to as a ground of confidence; to cause to feel certain; give confidence to,'' etc. No good reason for a limitation of the meaning of the word in its application to warranty has been shown to exist. Under the circumstances of the transaction the sale was as clearly an express warranty as though respondent had specifically inquired of appellant whether or not it had for sale for planting purposes Golden Yellow Celery seed and the reply had

been "Yes," and respondent, acting under such assurances, was misled to his damage. The conduct and acts of appellant cannot be regarded in any other sense than an affirmation made by it to respondent in regard to a matter about which it assumed to have superior knowledge.

The code sections governing warranty are sought to be modified by certain sections of the code dealing with the general subject of contracts. Much importance is attributed to the fact that a contract is defined as either express or implied. It is express when its terms are stated in words and implied when the existence of terms of the contract are manifested by conduct. (Secs. 1619 and 1620, Civ. Code.) An implied contract is in no less degree a contract than an express contract. The only difference between the two is in the mode of proof by which they are respectively established. (*Smith* v. *Moynihan,* 44 Cal. 53.) Other code sections providing for the explanation of contracts by reference to the circumstances under which they are made and stipulations which are necessary to make the contract conformable to usage or as necessary to carry them into effect are cited to sustain the ruling that the issue of warranty presented by the facts of this case is amenable to said sections. The contract under consideration is brief, clear, and unambiguous in its terms and there is no reason to resort to usage as an instrument of interpretation.

The effect of usage as evidence is limited by the provisions of section 1870, subdivision 12, of the Code of Civil Procedure, as follows: "Usage, to explain the true character of an act, contract, or instrument, where such true character is not otherwise plain; but usage is *never admissible,* except as an instrument of *interpretation."* (Italics ours.) Usage of trade cannot be proved contrary to the clear meaning of unambiguous contracts. (*Holloway* v. *McNear,* 81 Cal. 154 [22 Pac. 514]; *Polhemus* v. *Heiman,* 50 Cal. 438; *Ah Tong* v. *Earle Fruit Co.,* 112 Cal. 679 [45 Pac. 7], *Langenberger* v. *Kroeger,* 48 Cal. 147 [17 Am. Rep. 418].) A clear, certain, and distinct contract cannot be modified by proof of custom inconsistent with it or which expressly or by necessary implication contradicts it. (*Champion Mach. Co.* v. *Ervay* (Tex.), 16 S. W. 172; *Globe Mill Co.* v. *Minneapolis Elevator Co.,* 44 Minn. 153 [46 N. W. 306].)

Appellant relied upon its printed catalogue as a basis for the establishment of custom by which it also sought to bind the respondent on the question of notice. While the catalogue contains the nonwarranty notice heretofore set out there is also set out on the same page a statement or notice that appellant *maintains at a great expense trial grounds* where extensive *tests* are made of seeds. On another page under the caption of ''Celery,'' printed in bold-face type, appears the following: ''Golden Self-Blanching California Stock. Similar to French stock; seed raised in California from selected plants.'' Directly beneath in the same style of type are printed the following words: ''Golden Self-Blanching French Stock. See specialty opposite.'' In another column, on the same page, in bold-face type, appear the words, ''Golden Self-Blanching Celery Seed (French stock).'' ·The body of the article follows, a portion of which is general as well as specific: ''The trial ground test in comparison with samples of seed from thirty growers should prove the selected lot to be as fine seed as can be produced. This is exactly the test we applied to this year's stock of this variety, and even at the present high price of celery seed we are satisfied we are offering the greatest value for the money in this tried and true sort. Celery seed has for many years been a strong item with Germain's for purity and high quality, but with the establishment of our testing ground we are in a better position than ever to praise this item . . . ''

These statements are not by way of inducement but are positive statements of material existing facts. Surely, if respondent is to be bound by the catalogue offered in evidence as to the nonwarranty notice he should be entitled to the benefit of those portions which have the direct effect of neutralizing the force of the nonwarranty clause. Two important statements are there made: First, that the seed sold was raised in California from *selected* plants; second, that *trial grounds are maintained where tests are made of seeds*. These statements, as set out in the catalogue, were well calculated to lead a buyer into the belief that if the seed was not grown by appellant it had at least been tested and found true to variety.· They surely amount to an assertion of superior knowledge on the part of the seller which

is one of the underlying principles that support the rule of warranty.

The question of whether a vendor merely states an opinion or judgment upon a matter of which the vendor has no special knowledge and on which the buyer may be expected also to have an opinion, and to exercise his judgment, is not an issue in this case.

The instant case must be solved by the following legal test: Was the sending of the seed in response to the written order, in the light of all the circumstances of the transaction, *intended to cause the sale*, and was it *operative* in *causing* it? To my mind "yes" is the only rational answer that can be given to the question.

Upon a consideration of this very interesting subject, I am of the opinion that there was a warranty of the celery seed sold by written request, and assent thereto so clear and unambiguous as to leave no room for the introduction of usage as a means of interpretation; that if a local custom or usage prevailed it was not sufficiently shown by the evidence offered for that purpose to be of that general or notorious character as to charge the public with notice thereof. The jury was fully instructed as to the effect of custom or usage and its binding effect upon respondent if they should find that the existence of either or both was brought to the attention of respondent. If any error was committed it is not so serious but that it may be brought within the provisions of article VI, section 4½, of the state constitution. I think the judgment should be affirmed.

Lawlor, J., concurred.