[Civ. No. 6290. First Appellate District, Division One.—July 31, 1928.]

W. O. TODD, Respondent, v. EDWIN A. MESERVE et al., Appellants.

Meserve & Meserve and Timon E. Owens for Appellants.

McComb & Hall for Respondent.

CAMPBELL, J., *pro tem.*—In this action plaintiff prays judgment against defendants in the sum of $20,302.28, and defendants Shirley E. Meserve, Robert B. Moran, and T. Howard Knight, individually and as trustees of an express trust, by way of cross-complaint pray judgment against plaintiff in the sum of $100,000.

About July 27, 1923, plaintiff, W. O. Todd, and defendants, Shirley E. Meserve, T. Howard Knight, and Robert B. Moran, as trustees of an express trust, entered into a written contract by the terms of which W. O. Todd agreed to drill an oil-well by the rotary method to be known as "Meserve-Knight-Moran No. 1" upon property in the so-called Signal Hill oil-field. This contract provided, among other things, that the trustees should furnish at the location of the well a complete derrick, boilers (to be set up and connected and steam line carried to the derrick

floor), water, fuel, lights sufficient for the boilers and for drilling, and for lighting of the derrick, and all casing; that Todd should furnish all the necessary and proper rotary machinery, drill-pipe, tool joints, drilling engines, pumps, and other necessary rotary equipment and tools, and all labor necessary to drill the well to a depth of approximately 3,500 feet. By the terms of this contract Todd also agreed to drill the well and land casing in such size and dimensions as should be directed by the trustees and to set approximately 3,500 feet of 8¼-inch casing. By the terms of this contract Todd was to be entitled to no compensation unless he landed this 8¼-inch casing at or approximately at the 3,500-foot level. The contract further provided that the trustees should pay Todd for the drilling of the well and the landing of this casing at or approximately at the 3,500-foot level $22,500, and that Todd should in addition to this sum, upon landing of the water string at or approximately at the 3,500-foot level, be entitled to receive from the trustees an assignment of twelve and one-half per cent interest of the net proceeds of all oil or gas produced from the well over and above the cost of maintenance and deduction on account of taxes and royalties. The contract further provided that upon Todd's landing the water string at or approximately at the 3500-foot level he should turn over and deliver the hole to the trustees with casing properly set and open to the full diameter for the full length.

For the completion of the well below the approximate depth of 3,500 feet the contract provided that Todd "furnish all of his equipment, tools and appliances to the trustees, until said well is completed, for the rental of twenty-five ($25.00) dollars per day and shall perform the necessary labor for drilling said well, and said trustees agree to pay for all of contractor's (Todd's) labor and drilling crews, until such well is completed, at the rate of $.... per day, together with the necessary supplies and the cost of the proper and necessary insurance, compensation or otherwise, after the drilling in of said well after the landing of the water string."

The contract further provided that the depths mentioned therein were approximate only, and that drilling was to be stopped or continued as directed by the trustees, and

casing landed at points designated by the trustees as changes in formation might make advisable. By written indorsement at the end of the contract defendants T. Howard Knight, Robert B. Moran, Lawrence N. Wagner, Shirley E. Meserve, L. J. Fleming Bremner, and Edwin A. Meserve guaranteed the performance of all of the terms and conditions thereof to be performed on the part of the trustees and the payment of all moneys that might become due to Todd in accordance with the terms of the contract.

The work of rigging up the well was started on July 15 or 16, 1923, and the well was spudded in and drilling operations commenced on July 31, 1923. On September 11, 1923, a depth of 3,456 feet had been reached and the 8¼-inch water string was landed and cemented at that depth on September 13, 1923. This completed the first stage of the work under the contract. There is no contention that the landing of the water string at the depth of 3,456 feet instead of at the depth of 3,500 feet as provided in the contract was not a satisfactory performance by Todd of his obligations under the contract with respect to the landing of this string, or that Todd was upon the landing of the water string at that depth not entitled to the consideration which it was provided in the contract he should be entitled to receive upon the landing of the water string. The complaint alleges—and it is not denied in the answer— that Todd landed the water string at approximately 3,456 feet, "which was the depth then and there designated by the first parties to said drilling contract."

Upon the landing of the water string the drilling of the well proceeded and a 6¼-inch casing was landed at a depth of 4,165 feet. On February 17, 1924, the well had been drilled to a depth of 4,761 feet and on that day an attempt was made to run a 4¾-inch oil string into the hole. This oil string stuck at a depth of 230 feet from the bottom of the hole. The following day and while an effort was being made to work this oil string loose the oil string parted, leaving approximately 194 feet of the oil string in the bottom of the hole. This necessitated the drilling of a new hole past the portion of the oil string lost in the bottom of the first hole. This work of side-

tracking was immediately undertaken and a new hole drilled to a depth of 4,705 feet. Into this hole another oil string was run and cemented, and about April 23, 1924, the well was placed on production at approximately 1,200 barrels per day. Todd was paid the consideration which by the terms of the contract it was agreed should be paid him upon the landing of the 8¼-inch water string, i. e., $22,500 in cash and an assignment of a twelve and one-half per cent interest in the net proceeds of oil or gas produced from the well. Concerning this there was no dispute.

For the drilling of the well below the depth of 3,456 feet plaintiff claims the following amounts: (1) amounts paid by him for labor and drilling crews $31,644.11; (2) rental of his equipment, tools and appliances at the contract rate of $25 per day for 223 days, $5,575; (3) amounts paid by him for necessary supplies, $447.92; (4) amounts paid by him for workmen's compensation insurance, $1,469.82; making a total of $39,136.85.

Appellants urge that respondent under the contract was required to furnish equipment; that the salary of J. P. Evans (foreman or "tool pusher") is not included in the contract as part of the labor appellants had agreed to pay; respondent was negligent in landing the oil string; appellants were wrongfully charged for labor while men were playing cards; refusal of instructions; the evidence is insufficient to sustain the verdict, and errors in admission of evidence.

The first two assignments may be considered together. Paragraph "eighth," which has to do with the completion of the well below the 3,500-foot depth, is as follows: "That it shall be particularly understood between the parties hereto that for the completion of said well below the approximate depth of 3500 feet, contractor shall furnish all of his equipment, tools and appliances to trustees, until said well is completed, for the rental of twenty-five dollars ($25.00) per day, and shall perform the necessary labor for drilling said well, and said trustees agree to pay for all of contractor's labor and drilling crews, until such well is completed, at the rate of $.... per day, together with the necessary supplies and the cost of proper and necessary insurance, compensation or otherwise, after the

drilling in of said well after the landing of the water string." It is the interpretation put upon this paragraph of the contract, together with such other parts as may shed light on the intention of the parties, that determines the main questions in controversy.

Appellants urge that Todd was under paragraph "eighth" of the drilling contract obligated to furnish for the drilling of the well below the depth of 3,456 feet all of the machinery, equipment and tools which he was under paragraph "fourth" of the contract required at any time to furnish for the drilling of the well down to a depth of 3,456 feet, and cite section 1641 of the Civil Code and other authorities upon the proposition that the whole of a contract is to be taken together so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. No exception, of course, can be taken to this fundamental rule. An application of this rule does not in this case, however, obtain the result contended for by appellants.

The drilling contract relates to two distinct operations: First, to the drilling of the well to a depth of 3,500 feet (by mutual agreement fixed at 3,456 feet), and, second, to the drilling of the well below that depth. The consideration which Todd was to receive is separately apportioned to these two distinct operations. For the drilling of the well to a depth of 3,456 feet the contract provided that Todd should receive $22,500 in cash and a twelve and one-half per cent interest in the net proceeds of all oil and gas produced from the well. The contract expressly provided that should Todd fail to reach this depth and land the water string at this level, he should not receive any compensation whatever, and that upon reaching such depth he should turn over and deliver the hole to the trustees with casing properly set and open to the full diameter for the full length. For the drilling of the well below the depth of 3,456 feet the contract provided for an entirely different scheme of compensation. Todd was to "furnish all of *his* equipment, tools and appliances . . . for the rental of $25.00 per day" and perform the necessary labor for the drilling of the well and the trustees were to pay for all of Todd's labor and drilling crews and for all necessary supplies and for the cost of proper

and necessary insurance. It would seem to be beyond dispute that the parties to the drilling contract intended that the work to be done under the contract should include two distinct operations. Two distinct methods of compensation were provided for and it follows that Todd's obligations, the performance of which entitled him to compensation, were also distinct.

The distinction between the two methods of compensation so clearly stated in the contract of itself indicates that the parties must have intended that Todd's obligations for the drilling of the well down to the depth of 3,456 feet would be different from his obligations for the drilling of the well below that depth. The first stage of the work was to be accomplished by Todd for a lump sum. He was to be entitled to the sum of $22,500 and to an assignment of a twelve and one-half per cent interest in the net proceeds of all oil and gas produced *only in the event* that he drilled the well to the depth stated and landed the 8¼-inch casing at that depth. There can be no dispute that Todd was obligated to provide his own means for accomplishing this portion of the work with the exception of those things which it was expressly provided the trustees should furnish, that is, the derrick, boilers, steam line connections, water, fuel, lights and casing. Whatever tools, materials, equipment and supplies were required for this portion of the drilling, Todd, was himself—with the exceptions noted—bound to procure and pay for. With respect to the second stage of the drilling, however, the method of determining Todd's compensation itself indicates that the obligations of the parties to the contract were entirely different. It is clear that under the contract Todd was during this second stage of the work to be entitled to compensation at a given rate and upon a stated basis irrespective of the depth drilled below 3,500 feet. Below that depth he did not in effect guarantee to reach any given level as a condition precedent to his right to compensation.

It follows, therefore, that appellants' endeavor to interpret paragraph "eighth" of the contract in the light of paragraph "fourth" of the contract is not proper, if the contract is to be taken as a whole and effect given to its every part. Paragraph "fourth" deals with Todd's obligations during the first stage of the drilling. Paragraph

"eighth" deals with Todd's obligations during the second stage of the drilling. Interpretation of the language used in the contract defining the obligations of the contractor during the first stage of the drilling can throw no light upon the meaning of the language used to define the obligations of the contractor during the second stage of the drilling.

It is not difficult to arrive at a fair and reasonable interpretation of the language of paragraph "eighth" declaring that the contractor shall "furnish all of his equipment, tools and appliances" to the trustees. This paragraph of the contract became effective for the first time when the well had been drilled to a depth of 3,456 feet. The situation of the parties was then altogether different from the situation of the parties at the commencement of drilling operations. It must be assumed that the parties when they entered into the contract knew that when this depth was reached Todd would have at the location of the well or at his immediate command certain equipment, tools, and appliances, the greater part of which he had been using in the drilling operations to that point. The fair and reasonable meaning of this language is that it was only such equipment, tools, and appliances which Todd was to be obligated to furnish in the prosecution of future drilling operations. The use of the word *"his"* is significant in this connection. Had the construction contended for by appellants been contemplated, this clause would have read "all equipment, tools, and appliances necessary at any time thereafter for the drilling of said well," instead of the clause which was in fact used, viz., "all of *his* equipment, tools, and appliances."

It appears that frequently casings are lost and the drill pipe or drill stem breaks in the hole and special equipment is required to remove it; that certain accidents in well drilling happen which might reasonably be anticipated to require the use of special implements not ordinarily owned by the drilling contractor. The Baash Ross cutter is an example of this. It appears that this device cannot be purchased, but must be obtained upon a rental basis. It is used in cutting off and removing from the hole portions of a drill pipe broken off and lost in the hole. It appears from the testimony of plaintiff that between September 13,

1923, and November 28, 1923, he employed such a cutter at a rental of $3,420. During the same period he was entitled under his contract to receive for all his equipment, tools, and appliances but $1,900. It is not fair to assume under the wording of the contract that Todd while renting his equipment, tools, and appliances, which he had at the well and which he used to complete the first part of his contract, assumed the obligation of furnishing for future drilling of the well any and all equipment, tools, and appliances as common mischance might require, no matter how costly.

That Todd drilled the well to the depth of 3,456 feet—a depth which is admitted by the pleadings to be the depth agreed upon by the trustees as the equivalent of the depth of the 3,500 feet mentioned in the contract—in a manner entirely satisfactory to the trustees, and that for this portion of the work the trustees voluntarily paid him the full compensation which they had agreed to pay for this stage of the work, is not disputed. Todd testified that at the depth of 3,456 feet he had at the well all necessary and proper rotary machinery, drill pipes, tool joints, drilling engines, pumps and all other necessary rotary equipment and tools for the drilling of the well below that depth, and that at that depth he furnished to the trustees for future drilling operations his equipment, tools, and appliances which he had at the well at that depth.

One of the important matters in dispute is the meaning of the phrase "necessary supplies," which in the contract the trustees agreed to pay for, as also for all the contractor's labor and drilling crews until such well was completed. Appellants object to certain bills which they claim respondent should pay, which are for rentals and equipment which was rented and used upon and in drilling the well and also repairs to tools; for tools and equipment bought by respondent for replacement or addition and for transportation. If these items are included in the phrase "necessary supplies," it is clear that under the contract the trustees were required to pay for them. Respondent contends that these items come under "necessary supplies" in well-drilling contracts. ██ It is axiomatic that where the language of a written contract is ambiguous, extrinsic evidence is admissible for the purpose of disclosing the

intention of the parties, and that a party to a contract is presumed in dealing with any individual in a particular profession or business to have dealt and contracted with such individual according to a usage of that business. ▮ When a contract is made with a man concerning the business of his craft, it is presumed to have been framed on the basis of such usage which will be availed of to shed light upon the meaning of the contract in so far as its terms are ambiguous.

In *Hind* v. *Oriental Products Co., Inc.,* 195 Cal. 655, 667 [235 Pac. 438, 443], the court says: "It is the general rule that when there is a known usage of the trade, persons carrying on that trade are deemed to have contracted in reference to the usage unless the contrary appears; that the usage forms a part of the contract, and that evidence of usage is always admissible to supply a deficiency or as a means of interpretation where it does not alter or vary the terms of the contract (*Brown* v. *Howard,* 1 Cal. 423; *Taylor* v. *Castle,* 42 Cal. 367; *Burns* v. *Sennett,* 99 Cal. 371 [33 Pac. 916]; *Union Ins. Co.* v. *American Ins. Co.,* 107 Cal. 333 [48 Am. St. Rep. 140, 28 L. R. A. 692, 40 Pac. 431]; 6 Cal. Jur. 315, and cases cited; *Miller* v. *Germain etc. Co.,* 193 Cal. 62 [32 A. L. R. 1215, 222 Pac. 817])."

There is positive evidence to the effect that the term "supplies" has a particular meaning in the oil business. R. E. Stearns, field manager of the Universal Consolidated Company, who testified that he had been in the oil business about 30 years and had had experience in all branches of this business from roustabout and dresser of tools to superintendent and manager, testified that the term "supplies" meant anything used in connection with the drilling or maintenance of an oil-well; that it included rent of tools; that it included replacements of parts which were used in the drilling of a well; that this term would include pipe, fittings, cordage—in fact anything that was used around a well. Ralph Winger, superintendent of drilling and producing for the Standard Oil Company in the northern Santa Fe fields, testified that he had been in the oil business all his life and had drilled 90 wells in Santa Fe Springs and 140 wells on the Murphy lease, and further testified that anything that was taken out to a rig during drilling or operation was charged as "supplies"; that dump carts,

oils, wrenches, gate valves, hose, water hose, mud hose, crown box, shoes, and all "such stuff" were supplies. Robert B. Moran, one of the defendant trustees, a petroleum engineer and geologist who looked after all the "engineering work" for defendant trustees, testified that the dressing down of tools and bits, the remodeling of a taper tap, the recutting of a tooth in a rotary shoe, the building up of a Hosmer blowout preventer and the building up of gums would be "supplies" within the meaning of that term as used in the oil business. Plaintiff Todd testified that in the oil-well business the word "supplies" had a particular meaning; that this term, as used in the oil business, meant materials that were used in the drilling of the well, such as replacements for broken parts; that it meant anything aside from the drilling equipment itself that was spent in drilling the well, the material aside from the original equipment.

It can hardly be contended that defendant trustees were not at the time they entered into the drilling contract familiar with this meaning. The trustees were three in number: Shirley E. Meserve, T. Howard Knight, and Robert B. Moran. Mr. Meserve testified that he had been in the drilling business for a period; Mr. Knight was connected with the Rio Brave Oil Company, and Mr. Moran, as already noted, was an expert petroleum engineer and geologist. The jury was therefore justified in finding that the term "necessary supplies" had a particular meaning according to the usage of the oil business, and that this meaning was known to the defendant trustees at the time they entered into the drilling contract. In using this term in the drilling contract the parties must be deemed to have used it in accordance with the meaning given it by this usage. Evidence of this usage was admissible despite the fact that such usage had not been pleaded (*Becker* v. *Incorporated Town of Churdan,* 175 Iowa, 159 [157 N. W. 221]; *Globe and Rutgers Fire Ins. Co.* v. *David Moffat Co.,* 154 Fed. 13, 22; *McDonald* v. *Union Hay Co.,* 143 Minn. 40 [172 N. W. 891]).

We do not agree with appellants' contention that the salary of J. P. Evans is not included as a part of the labor which appellants had agreed to pay. Paragraph "eighth" of the drilling contract obligated appellant trus-

tees to pay for all of respondent's "labor and drilling crews." Appellants have cited and discussed several authorities indicating that the word "labor" does not include services performed by a superintendent. From these cases appellants argue that the word "labor" must be construed to mean "manual labor," from which it follows that a salary paid to a superintendent is not a charge for "labor." *McCreary* v. *Toronto Midway Oil Co., Ltd.,* 38 Cal. App. 17 [175 Pac. 87], is the only California case cited to support appellants' contention. That was an action brought to foreclose a mechanic's lien. In that case plaintiff, who claimed the lien, did not state that he had performed any services of any description upon or for the benefit of the property upon which he sought to foreclose the lien. The court points out that there is nothing in the claim of lien which indicates that the claimant performed any manual labor; that so far as his lien is concerned plaintiff's case "can be no stronger than is set forth in his claim of lien, and in that, as we have seen, there is no statement as to manual labor." The case was also decided upon the ground that the claim of lien had been prematurely filed and therefore conferred no right to a lien.

In *Kritzer* v. *Tracy Engineering Co.,* 16 Cal. App. 287 [116 Pac. 700], where plaintiff had acted as foreman or superintendent of construction work in connection with the erection and construction of a power plant upon a millsite, which case involved the same principle confronting us here, the court says: "It is finally contended that plaintiff could have no lien upon the property for work and labor performed in the construction of the plant so contracted to be erected upon the property by the Tracy Engineering Company, for the reason that said work and labor was done and performed as foreman. . . . This question was before the supreme court of Nevada (*Capron* v. *Strout,* 11 Nev. 310), and the court there said, Beatty, Judge, writing the opinion: 'It is argued that the intention of the law was to secure those only who performed labor upon the mine with their hands; that to give it a wider construction, one that will make it include wages of a foreman like Stuart, will make it cover the case of a general superintendent and other officers of a corporation, and thereby impair the remedy of those who are the special

objects of the legislative care. . . . According to the findings he certainly did work in the mine, though not with his hands, and it is clear that the direct tendency of his work was to develop the property. We think the foreman of work in the mine is as fully secured by law as the miners who work under his direction.' To the same effect is *Cullins* v. *Mining Co.*, 2 Utah, 219, which is affirmed in same case (*Mining Co.* v. *Cullins*, 104 U. S. 176 [26 L. Ed. 704]). These cases were decided under statutes almost identical with section 1183 of the Code of Civil Procedure (citing cases).'' In *Hornlein* v. *Bohlig*, 37 Cal. App. 646 [174 Pac. 697], the court affirmed a judgment allowing plaintiff, who was an engineering expert, a mechanic's lien.

■ If the testimony of respondent is to be believed—and his credibility is entirely a question for the jury or the trial court—the defendant trustees reasonably anticipated at the outset that they would be charged for Evans' services. Respondent testified that prior to the execution of the contract he had a conversation in Dr. Knight's office at which Dr. Knight, Mr. Shirley Meserve, Mr. Wagner and possibly Mr. Bremner and Mr. Moran were present; that the cost of the well below the 3500-foot mark was discussed; that Dr. Knight asked him: ''What are you going to charge for the tool pusher?'' and that he replied that he paid the tool pusher $500 a month, and that he (Todd) also stated: ''If I am drilling more than one well there I will prorate his time.''

Commencing with the time the well was drilled below the depth of 3,456 feet, the evidence is clear that the trustees knew that Evans was performing services as ''tool pusher'' in connection with the drilling operations below that depth. They were constantly receiving carbon copies of orders upon supply houses and well reports signed by Evans. Furthermore, it appears that defendant trustees paid cash in full settlement of all statements rendered prior to November 21, 1923; that for a period of more than two months after the commencement of the second stage of the drilling they paid statements which included an itemized charge for the salary of Evans. It is apparent, therefore, that appellants placed the construction on the contract here indicated with reference to the meaning of the terms ''labor'' and ''necessary sup-

plies''—they have so shown by their acts under it. As was said in *Retsloff* v. *Smith,* 79 Cal. App. 452 [249 Pac. 889]: ''Lord Chancellor Sudgen once said: 'Tell me what you have done under a deed, and I will tell you what that deed means.' If the language of an instrument can be considered doubtful, the court will call in the aid of the acts done under it as a clue to the intention of the parties (citing cases). . . . To hold otherwise a construction would have to be placed upon the contract that would be extremely technical and literal without reference to what the parties intended.''

There is no merit in appellants' assignment that respondent was negligent in landing the oil string. The testimony is that Todd discussed his plan with trustee Moran, who is a geologist and mining engineer and who looked after the work for defendant trustees, and Moran testified: ''I told him (Todd) that that was satisfactory to me, if he thought that would accomplish the end. I told Mr. Todd both at the beginning of the conversation and at the end of it that his experience in matters of handling pipe was much greater than my own and I preferred to defer to him in such matters. . . . The last thing he (Todd) said when I left—I believe the conversation took place down in the field—that the pipe would be run with a cased end, and the two joints of black pipe on the end of it, and I told him that that was all right with me, but if he figured out a better way to do it before I would come out that he would—would it be all right for him to do it.'' Mr. McCutcheon, the vice-president of Formax Oil Company, testified that he had ''lowered several strings where we closed the bottom of the pipe in a torpedo shape,'' exactly in the manner shown by defendant's exhibit 2. Mr. Stearns, field manager of the Universal Consolidated Oil Company, testified that the use of a ''sealed shoe'' was not confined to instances where there was some obstruction in the hole; that ''it is customary for me to use a pointed sealed shoe and every one of those I used is still in the well. I didn't use an open shoe in any of the wells I drilled in Los Angeles county—nor in Torrance nor Santa Fe Springs.'' Mr. Winger, superintendent of drilling and producing for the Standard Oil Company, stated that he used closed ends like that

exhibited in Defendants' Exhibit 2. It is true that there were several witnesses who testified to the contrary and who stated that they had never seen a shoe with an end similar to that exhibited by Defendants' Exhibit 2. This, however, merely raised a conflict which was for the jury under the instruction given by the court that in drilling the well plaintiff was bound to exercise that degree of skill which those of his trade or profession ordinarily possess.

Appellants' complaint that they were wrongfully charged for labor while the men were playing cards may be answered by the testimony of the drillers engaged in drilling the well. Mr. Dellinger testified that he observed the men playing poker; that "every few days they would play," but that it was customary for members of the crew to play cards or amuse themselves in some way during their shifts when not actually engaged in work; that during a shift when a well is being drilled there was not work for each and every member of the crew at all times during each shift; that at the times when he saw members of the crew playing cards there was no work which they could do; that when running a Hughes bit a driller could sometimes spare four of the crew for the entire eight-hour shift, but that it was necessary to have those men there during that shift, even though they were not actively engaged in some work connected with the drilling, in case some trouble should occur—"a twist-off or engine breakdown or something like that"; that when running a Hughes rock bit the motion of the machinery was very, very slow and that at such times one man could operate the machinery and bit; that when running with that bit, on a day shift, the other members of the crew could probably be doing something around the derrick, but that on the night shift it was not customary for them to do that; that during the time when there was daylight there was not always something for the men to do around the derrick when they were not actually required on the drilling of the hole. Mr. Hamilton testified that he did not remember that there was any poker playing on the derrick when he was in charge; that he did not himself play poker when he was on the job. The witness, however, testified that while he was operating the rock bit his men were not at all times engaged in some work; that if there weren't anything

to do on the rig they would read a magazine, or do anything they wanted to, as long as they were at the rig in case they were wanted. Mr. O. Pyron said that he believed that "once or twice" the men in his tour played poker while they were on the derrick; that he did not remember that this occurred more than that; that he thought he played once. This witness, however, testified that he himself never played cards when there was anything else he could do, and that none of his crew ever played cards when there was any work they could do; that it was customary for members of the crew when not actually engaged in their work to indulge in some pastime. Mr. M. Pyron, another driller, testified that the men did some few times play poker while he was in charge after the 3500-foot level had been passed but that this never occurred when there was any work they could do. While witnesses for defendants testified that on two or three occasions they saw members of the crews playing poker, they did not testify that at such times there was any work requiring their attention, nor to any fact from which it could reasonably be inferred that any loss resulted to defendants therefrom.

Appellants urge error in refusing defendants' proposed instructions numbered 1, 3, 6, 7, 8, 9, 14, 18, 19, 20, and 21.

By instruction 1 defendants requested the court to instruct the jury without qualification that the items of defendants' counterclaim, amounting to $11,771.56, were proper charges in favor of defendant trustees and that they were entitled to recover on their counterclaim this exact amount. Included in this amount there were numerous items for which upon any interpretation of the contract defendant trustees were bound to pay. As to the refusal of instruction 3, it may be said that the jury found that plaintiff was not negligent in failing to land the 4¾-inch oil string. If this finding is supported by the evidence, then this instruction is immaterial, and its refusal is not reversible error. Further defendants sought in this instruction to have the court declare to the jury that under their cross-complaint defendants were claiming $14,753.04 on account of oil which would have been produced between February 19, and April 23, 1924, less the cost of production and maintenance. Defendants' contention is that but for the negligence of

plaintiff the well would have been put upon production about February 19, 1924. There is some evidence concerning the production after the well was brought in on April 23, 1924, and from this the total net production during a certain period thereafter could be computed. The conclusion, however, from Mr. Moran's testimony that he thought the well would have produced more oil during the period in question is of necessity mere speculation, and upon the evidence in the record there is no foundation for any claim to damages on account of loss of oil by reason of a delay in the completion of the well, much less a claim reduced to actual dollars and cents. This element of damage is too remote and speculative (*Corbin Oil & Gas Co.* v. *Mull*, 123 Ky. 763 [97 S. W. 385]). Again, the requested instruction merely covered certain of defendants' contentions and in support of the judgment it will be assumed that the jury was fully advised of defendants' contentions in the argument to the jury in the absence of a showing of reversible error. As to instruction 6 we may say that as both parties conceded that the jury should pass upon the meaning of the term "labor" as used in drilling contracts and both having requested instructions leaving to the jury to determine whether the services of Evans would properly come within the meaning of the term "labor," the instruction as requested, which in effect took from the consideration of the jury all facts indicating how the parties themselves may have construed the term, was properly refused. The instruction directed the jury to disallow all claim on account of Evans' salary in the event that they disbelieved plaintiff's testimony concerning his conversation with the defendant trustees, and would tend to confuse or mislead the jury by diverting their attention from a portion of the evidence (*Fox* v. *Harvester Works*, 83 Cal. 333 [23 Pac. 295]). Instructions 7, 8, and 9 relate to poker playing by members of plaintiff's drilling crews. In the absence of evidence showing that members of the drilling crews played poker when there was work for them to do at the well, there is no foundation for the instruction. The testimony is without contradiction that none of the members of the crews played cards when there was work around the well that could have been done. It is well settled that even where a

requested instruction is pertinent to an issue, the refusal of the instruction is proper, if under the evidence the issue could be determined in only one way (*Sill* v. *Ceschi*, 167 Cal. 698, 704 [140 Pac. 949]; *Estate of Budan*, 156 Cal. 230, 234 [104 Pac. 442]; *De Soto* v. *Pacific Electric Ry. Co.*, 49 Cal. App. 285, 288 [193 Pac. 270]; *McCollum* v. *Barr*, 38 Cal. App. 411, 429 [176 Pac. 463]). ▮ Instructions 14, 18, 19, 20, and 21 are directed to the issue relating to plaintiff's alleged negligence in failing to lower successfully the string into the well. These instructions are in any event merely cumulative, singling out particular means or instrumentalities employed by plaintiff in the drilling operation. The jury was instructed fully as to the degree of skill, care, and diligence required to be exercised by plaintiff in the instructions given, and, therefore, no error results from a refusal to give these instructions singling out details or means employed. The jury was instructed: "If you find from the preponderance of the evidence in the case that Mr. Todd, the plaintiff in this case, was negligent in any of the respects alleged in the cross-complaint on file herein against him, and that such negligence proximately resulted in the sticking of the 4¾-inch oil string, in the month of February, 1924, then and in such event you are instructed to find in defendants' favor, on their cross-complaint, for such damages as, from the evidence, you find they approximately sustained by reason of such negligence. Plaintiff at all times when on the well in question was bound to exercise that skill which those in his then trade or profession possessed, and was bound to do only those things which those thus trained and skilled would have then done under all the circumstances and conditions that then existed, and was then bound not to do all such things as those thus skilled in his trade or profession would not have done under the circumstances and conditions then existing."

▮ As to appellants' assignment that the evidence is insufficient to sustain the verdict, it may be said that we think there is no merit in the contention. The only question raised which has not been touched upon is the question of the premiums paid on compensation insurance. Appellants make the contention that the verdict is not sustained by the evidence in regard to these charges; that

the record clearly shows that one premium was paid to cover all the employees of plaintiff, many of whom were working on other wells and that the bookkeeper made an arbitrary division of the insurance premium.

It is true that these policies of insurance covered Todd's employees engaged in his entire business operations whereever such operations might have been conducted. However, it is provided in these policies that the premium shall be based upon the entire remuneration earned during the policy period by all employees engaged in Todd's business operations described in the policy and covered thereby. The rate stated in these policies for employees is the same in each policy, viz., $5.02 per $100 of remuneration. This rate was called to the attention of the court at the time these policies were introduced in evidence. It is conceded that the entire time consumed in drilling the well below the depth of 3,456 feet was 223 days. The drilling operations were continuous for a period of 24 hours per day and were divided into three shifts or "tours" of eight hours each, so that during each 24-hour period three separate crews were employed in the drilling operations. The testimony is clear and undisputed that during this entire period there were five members of a drilling crew employed on each shift or tour, viz., a driller, a derrick man, a cathead man, a fireman, and a floor man, and that the driller received $15 a day, the derrick man $7.50 a day, the cat-head man $7.50 a day, the fireman $7 a day and floor man $7 a day. The amount of these wages paid during this period is fixed by stipulation of counsel. The aggregate wage paid to a crew of five men for a single tour was therefore $44. Since there were three tours during each 24-hour day, the aggregate wage paid to the members of all crews employed during a given day was $132. Since the entire period involved was 223 days, the aggregate amount of wages paid to members of the drilling crews during the entire period was $29,436. The salary paid to J. P. Evans as foreman during this period of 223 days was $2,537.31. This makes a total of $31,973.31, and this amount exceeds the amount actually claimed by Todd on account of amounts paid by him for labor and drilling crews. The daily well reports or drilling reports covering this entire period of 223 days were offered and received in

evidence as plaintiff's exhibit 10 without objection. The total amount paid by plaintiff during the period of 223 days is therefore determined, and the policies .of workmen's compensation insurance specifying as they do the rate of premium at $5.02 per $100 of remuneration, it was simply a matter for the jury to compute the portion of the premium covering the operations in connection with the well in question.

Appellants under their assignment "Errors in Admission of Evidence" enumerate a great many instances in which it is claimed that the court erred in admitting evidence over their objections. They do not, however, argue their objections in their brief nor cite any authorities, and therefore these objections are not to be considered (*People* v. *Hayes,* 72 Cal. App. 292, 297 [237 Pac. 390]).

This disposes of the points urged by appellants, and as we find no error in the record calling for a reversal, the judgment is affirmed.

Tyler, P. J., and Knight, J., concurred.