[Civ. No. 37737. First Dist., Div. One. Sept. 27, 1976.]

PENN SECURITY LIFE INSURANCE COMPANY,
Plaintiff and Appellant, v.
JOHN S. RISING, JR., Defendant and Respondent.

**COUNSEL**

Hoge, Fenton, Jones & Appel and Randall E. Willoughby for Plaintiff and Appellant.

John J. Mullane, Jr., for Defendant and Respondent.

**OPINION**

**ELKINGTON, J.**—The appeal before us was taken by plaintiff Penn Security Life Insurance Company ("Penn Security") from an adverse judgment in its declaratory relief action against defendant John S. Rising, Jr. ("Rising"), and others.

The issue in the superior court was, whether a valid contract of credit life insurance on the life of one David L. Morris, M.D., ever came into existence between Penn Security and Rising. The trial court concluded that such a valid contract had come into existence.

Our task is the determination whether the trial court's finding was supported by the evidence. It seems proper at this point to reiterate the substantial evidence rule of appellate procedure. When a trial court's finding or a jury's verdict is attacked on the ground that it is not sustained by the evidence, the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding or verdict. Questions of credibility must be resolved in favor of the fact-finder's determination, and when two or more inferences can reasonably be drawn from the evidence, a reviewing court may not substitute its deductions for those of the trier of fact. If on any material point the evidence is in conflict, it must be assumed that the court or jury resolved the conflict in favor of the prevailing party. (See *Nestle* v. *City of Santa Monica*, 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.*, 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805].)

Under this test, the record establishes the following.

"Credit life insurance" means insurance on the life of a debtor for the security of his creditor pursuant to or in connection with a loan or other credit transaction. (See Ins. Code, § 779.2, subd. (1).)

Although greater amounts were often applied for, a life insurance company, for statutory or other reasons, could not write more than $10,000 of such insurance on any one risk.

Penn Security was a life insurance company which, among other things, issued policies of credit life insurance. Its general agent was Compucar Financial, Inc. ("Compucar"), with authority to act for Penn Security in such matters as are here at issue.

Reliance Standard Life Insurance Company ("Reliance Standard") also issued policies of credit life insurance. Its general agent was Gordon Company ("Gordon"), with authority similar to that of Compucar.

A general agent may "go out and appoint agents." Compucar had, on behalf of its "lead" company, Penn Security, entered into a subagency agreement with Gordon, which on behalf of Reliable Standard had entered into a like relationship with Compucar; they had "just traded subagreements." There was no agreement in writing, the general agents

had just verbally agreed, and had "appointed one another" to do business with their respective companies.

The relationship was particularly active in the field of credit life insurance, for which Penn Security and Reliable Standard often had applications for amounts greater than they individually were permitted to write. Each had "written a number of excess policies" with the other. This excess credit life insurance (over the allowed $10,000 for one company) was allocated in permitted amounts to companies having the relationship here described between Penn Security and Reliable Standard. It appears that in this fashion Reliable Standard and Gordon had allocated an average of about eight such excess coverages each month to Penn Security and Compucar.

Credit life insurance required no physical examination. "[T]he theory of credit life is that they charge a lesser rate, and take everybody, and there's no underwriting." The agents and companies "do not have the power to say no, we don't want this one, we don't want that one. Credit life has to be offered and written on anybody who wants it, and the only underwriting guides are that the man or lady has to be eighteen years old, and no older than sixty-five, and up to last year you could only place $10,000 in one company on one life." Conforming applications were always accepted by the respective general agents and companies of this case.

It was the practice for each general agent to encourage and accept credit life insurance applications, regardless of amount, for its lead company, Penn Security or Reliable Standard. That company would write $10,000 or less of the application and parcel out the remainder, if any, with checks for the premiums, to other companies with which it had the above-described relationship. There were often, of course, delays attending the writing of these policies, but when written their coverage and the premium charge therefor were made retroactive to the date of application to the lead company. These allocations from the lead company were always accepted, as long as the interagency relationship existed.

The described practices appear to have been the custom and practice of the credit life insurance business, known to all of the above-described parties and defendant Rising.

Rising was in the business of lending money, or furnishing credit, to physicians and dentists. He had purchased an airplane and leased it to Dr. Morris. In the course of the transaction he applied to Reliable Standard, through Gordon, for credit life insurance of $30,000 on Dr. Morris' life. The application, dated December 20, 1973, was received by Gordon on December 26, 1973. Some time after January 15, 1974, apparently retaining $7,500 of the coverage for Reliable Standard, Gordon allocated the remainder to three other companies, including $7,500 to Penn Security. After notification thereof to Compucar, and contemporaneous payment of the premium of $300, Penn Security in due course issued its policy to Rising. Sixteen times previously Penn Security had in this manner written credit life insurance following Rising's applications therefor in amounts over $10,000, to Gordon and Reliable Standard.

Unknown to all of the affected parties, until after Rising's credit life insurance transaction had been completed, Dr. Morris had died January 1, 1974, in a boating accident. (There is no contention of fraud, or concealment or bad faith on the part of anyone, in relation to any aspect of the transaction.)

Penn Security thereafter disclaimed liability to Rising under its policy. The disclaimer led to the instant declaratory relief action, and to the judgment here under appeal.

The superior court, among other things, found: "That a valid contract of credit life insurance came into existance between plaintiff, Penn Security Life Insurance and defendant, John S. Rising, Jr. prior to the death of David L. Morris, M.D. on January 1, 1974, when defendant John S. Rising, Jr. placed his check for the payment of the premium of said credit life insurance and had the completed application . . . in the mail on December 24, 1973."

Penn Security's only appellate contention is that this finding was unsupported by evidence and by the law. We consider the evidence, and reasonable inferences therefrom, tending to support the trial court's finding. That contrary evidence and inferences might, as argued by Penn Security, have been found is of no consequence. (See *Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d 920, 925; *Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc., supra,* 66 Cal.2d 782, 784.)

It was patently of importance to Penn Security and Reliable Standard (and their respective general agents) that credit life insurance applications received by either of them be fully honored (as was done by the lead companies on the portions retained by them) as of the day of the applications' receipt. If such service was not rendered where excess coverage was sought, much business and customer goodwill would necessarily be lost. Moreover, the economic value of the excess insurance business from the other company would be jeopardized. Orally, and by their acts and conduct, the respective companies agreed that each would accept such amounts of excess credit life insurance as were thereafter, in good faith, allocated and offered by the other. Clearly, each intended that the other accept the excess coverage as of the day of the application to the lead company, regardless of events occurring before the actual writing of the policy. For if this were not so, the mutually beneficial agreement would lose all rational purpose; neither lead company would conceivably intend or permit a situation where its applicant, as to the excess insurance, would remain uninsured for an indefinite period until clerical, postal and perhaps other delays, finally permitted the writing and delivery of the policies. And that such was the parties' agreement is manifested by their practice, always, to make their policies and the premiums therefor, effective and earned, as of the earlier date.

Further, evidence was admitted, without objection, of a custom and practice of making the excess credit life insurance policy's coverage retroactive to the date of the application to the lead company, regardless of the insured's death before the excess policy could be written. The remaining companies, which had written excess coverage on Dr. Morris' life and Rising's application, had affirmed this custom and practice by payment to Rising in accordance with their policies' terms.

We have closely considered Penn Security's insistence that Gordon, in its discretion and following Dr. Morris' unnoticed death, *might not* have selected it to share the excess coverage. But we are concerned with the parties' contractual intent, as reasonably inferred from the evidence. We think the more reasonable inference, presumably drawn by the trial court, was that a good faith selection of the excess insurance carriers after, but before knowledge of, the insured's death would be respected. The alternative inference, that in such an event the parties intended no insurance coverage, was properly rejected by the trial court as unreasonable.

The subject agreements between Penn Security and Reliable Standard, and their respective general agents and subagents, were obviously for the benefit of third parties (see 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 499-500, pp. 428-430), such as Rising in the instant case, seeking the security of credit life insurance.

■  From all of the foregoing it will be seen that "a valid contract of credit life insurance" between Penn Security and Rising had come into existence, as found by the superior court.

This conclusion is amply supported by the law. An agreement may be established by the acts and conduct of the parties and all of the circumstances of the case. (Civ. Code, § 1621; *Desny* v. *Wilder,* 46 Cal.2d 715, 735-736 [299 P.2d 257]; *Silva* v. *Providence Hospital of Oakland,* 14 Cal.2d 762, 773 [97 P.2d 798]; *Minniear* v. *Tors,* 266 Cal.App.2d 495, 503 [72 Cal.Rptr. 287]; *Bush* v. *Lane,* 161 Cal.App.2d 278, 279-280 [326 P.2d 640].) "[G]eneral custom or usage must be considered in determining the intent of the parties, and are in effect a part of the contract unless the contract manifests a contrary intention . . . ." (*Miller* v. *Germain Seed etc. Co.,* 193 Cal. 62, 77 [222 P. 817, 32 A.L.R. 1215]; see also Civ. Code, § 1655; *Asso. Lathing etc. Co.* v. *Louis C. Dunn, Inc.,* 135 Cal.App.2d 40, 48-49 [286 P.2d 825]; *Todd* v. *Meserve,* 93 Cal.App. 370, 380 [269 P. 710].) And where such an agreement is subject to different inferences or interpretations, that which is the more reasonable must be drawn. (*Cohn* v. *Cohn,* 20 Cal.2d 65, 70 [123 P.2d 833]; *In re Marriage of Williams,* 29 Cal.App.3d 368, 380 [105 Cal.Rptr. 406].)

Relevant also is the public policy of this state as disclosed (1) by Insurance Code section 10115, q.v., stating in effect that the tardy writing of a life insurance policy should not deprive the insured of intended coverage, and (2) certain language of *Granco Steel, Inc.* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 191, 198 [65 Cal.Rptr. 287, 436 P.2d 287]: " 'Some difficulty on the score of the identity of the insurer exists where, as is often the case, an agent represents more than one insurance company. The element of identity is satisfied where the agent, being authorized to do so, *designates* the company which is to carry the risk.' . . . [¶] It is clear that 'designation' does not imply a meeting of the minds of the insured, the agent, and the insurer. 'When the agent represents several companies and selects certain [or one] of them to be bound by the risk, he is contracting for undisclosed principals. Each of the

companies he represents has intrusted him with the agency, and must be held to have given him authority as such agent to select it as the one to bear the risk.' " (Italics in original.)

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.